# 14-1048-cv(L)

## 14-1049-cv(CON), 14-1067-cv(XAP), 14-1068-cv(XAP)

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

CAPITOL RECORDS, LLC, a Delaware Limited Liability Company, CAROLINE RECORDS, INC., a New York Corporation, VIRGIN RECORDS AMERICA, INC., a California Corporation, EMI BLACKWOOD MUSIC, INC., a Connecticut Corporation, EMI APRIL MUSIC, INC., a Connecticut Corporation, EMI VIRGIN MUSIC, INC., a New York Corporation, COLGEMS-EMI MUSIC, INC., a Delaware Corporation, EMI VIRGIN SONGS, INC., a New York Corporation, EMI

(*Caption continued on inside cover*)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF FOR *AMICI CURIAE* GOOGLE INC.,
FACEBOOK, INC., YAHOO!, INC., AND MICROSOFT, INC.,
IN SUPPORT OF VIMEO, LLC**

MICHAEL ELKIN
THOMAS P. LANE
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166
(212) 294-6700

*Counsel for Amicus Curiae Microsoft, Inc.*

ROBERT TURNER
Legal Director
Yahoo!, Inc.
701 First Avenue
Sunnyvale, CA 94089
(408) 349-3878

*Counsel for Amicus Curiae Yahoo!, Inc.*

A. JOHN P. MANCINI
MAYER BROWN LLP
1675 Broadway
New York, NY 10019
(212) 506-2295

*Counsel for Amici Curiae Google Inc. and Facebook, Inc.*

GOLD HORIZON MUSIC CORP., a New York Corporation, EMI UNART CATALOG INC., a New York Corporation, STONE DIAMOND MUSIC CORPORATION, a Michigan Corporation, EMI U CATALOG, INC., a New York Corporation, JOBETE MUSIC CO., INC., a Michigan Corporation,

*Plaintiffs-Appellees-Cross Appellants*,

—against—

VIMEO, LLC, a Delaware Limited Liability company,
AKA VIMEO.COM, CONNECTED VENTURES, LLC,
a Delaware Limited Liability company,

*Defendants-Appellants-Cross Appellees*,

DOES, 1-20 INCLUSIVE,

*Defendant*.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for *amici* certifies that neither Google Inc., Facebook, Inc., Yahoo!, Inc., nor Microsoft, Inc., has any parent corporation, and that no publicly held corporation owns 10% or more of its stock.

## TABLE OF CONTENTS

**Page**


INTEREST OF THE *AMICI* .......... 1

SUMMARY OF ARGUMENT .......... 3

ARGUMENT .......... 6

I. Proper Application Of "Red-Flag" Knowledge Is Vital To The Operation Of The DMCA Regime .......... 6

A. For Good Reason, Congress Intended The Red-Flag Knowledge Provision To Apply Only In Limited Circumstances .......... 6

B. Online Services Cannot Practically Determine Infringement Without Knowledge of Specific Facts .......... 8

C. A Loose Red-Flag Knowledge Standard Would Chill Moderation Of Harmful Online Content .......... 12

II. The District Court Correctly Held That The Willful-Blindness Doctrine Cannot Be Used To Evade The DMCA's Specific Knowledge Requirements .......... 15

III. Expanding Red-Flag Knowledge And Willful Blindness Would Undermine The DMCA's Goal Of Stimulating Online Investment And Innovation .......... 18

CONCLUSION .......... 20

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Capital Records, LLC v. Vimeo, LLC*,
972 F. Supp. 2d 500 (S.D.N.Y. 2013)........................................16, 17

*Capitol Records, Inc. v. MP3tunes, LLC*,
821 F. Supp. 2d 627 (S.D.N.Y. 2011)........................................7

*Corbis Corp. v. Amazon.com, Inc.*,
351 F. Supp. 2d 1090 (W.D. Wash. 2004)........................................7

*CoStar Grp., Inc. v. LoopNet, Inc.*,
373 F.3d 544 (4th Cir. 2004)........................................14

*Global-Tech Appliances, Inc. v. SEB S.A.*,
131 S. Ct. 2060 (2011)........................................16, 17

*Perfect 10, Inc. v. CCBill LLC*,
488 F.3d 1102 (9th Cir. 2007)........................................6, 7, 8

*UMG Recordings, Inc. v. Shelter Capital Partners LLC*,
718 F.3d 1006 (9th Cir. 2013)........................................6-7, 8, 16, 17

*UMG Recordings, Inc. v. Veoh Networks, Inc.*,
665 F. Supp. 2d 1099 (C.D. Cal. 2009)........................................7, 10

*United States v. Aina-Marshall*,
336 F.3d 167 (2d Cir. 2003)........................................17

*Viacom Int'l, Inc. v. YouTube, Inc.*,
676 F.3d 19 (2d Cir. 2012)........................................4, 15, 16, 17, 18

*Viacom Int'l Inc. v. YouTube, Inc.*,
718 F. Supp. 2d 514........................................7, 8

*Viacom Int'l Inc. v. YouTube, Inc.*,
940 F. Supp. 2d 110 (S.D.N.Y. 2013)........................................16

*Wolk v. Kodak Imaging Network, Inc.*,
840 F. Supp. 2d 724 (S.D.N.Y. 2012)........................................................................ 15

**STATUTES**

17 U.S.C. § 107........................................................................................................ 12

17 U.S.C. § 512.......................................................................................... 1, 2, 3, 6, 8, 14

47 U.S.C. § 230(c) .................................................................................................... 14

**OTHER AUTHORITIES**

144 Cong. Rec. H7092 (daily ed. Aug. 4, 1998) ................................................................ 15

G. WILLIAMS, CRIMINAL LAW § 57 (2d ed. 1961) ........................................................... 16

H.R. Rep. No. 105-551(II)(1998) .................................................................................. 8, 19

H.R Rep. No. 105-796 (1998), *reprinted in* 1988 U.S.C.C.A.N. 639 (Conf. Rep.)............ 5

S. Rep. No. 105-190 (1998) ........................................................................................ 8, 19

Google Inc., Facebook, Inc., Yahoo!, Inc., and Microsoft, Inc. submit this brief as *amici curiae* to provide the Court with insight about the practical challenges that online services face as they enable billions of users around the world to store, access, and distribute content online, and why a proper application of the DMCA is necessary to avoid chilling the range of valuable activity that Congress intended to protect.[1]

## INTEREST OF THE *AMICI*

*Amici* are four of the world's largest and best-known online service providers, united in their reliance on the "safe harbor" provisions of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512 *et seq*.

Google Inc. ("Google") is a leading Internet search engine and provides a wide range of other products and services—including email through its Gmail service, online video through YouTube.com, a blogging platform through Blogger, and social-networking tools—that empower people around the world to create, find, organize, and share information.

Facebook, Inc. ("Facebook") is one of the world's leading providers of online networking services, and is one of the top five most-trafficked websites in the world. Facebook provides a free Internet-based service that enables more than one billion users to

[1] No one other than *amici* and their counsel—including the parties to this case—authored this brief in whole or in part, or contributed to its preparation or submission. All parties have consented to the filing of this brief.

connect with their friends and family, to discover what is going on in the world around them, and to share and publish the opinions, ideas, photos, and activities that matter to them and the people they care about.

Yahoo!, Inc. ("Yahoo!") is a global company with over 12,000 employees operating one of the most trafficked Internet destinations in the world. Yahoo is focused on making the world's daily habits inspiring and entertaining—whether searching the web, emailing friends, sharing photos with family, or simply checking the weather, sports scores, or stock quotes.

Microsoft, Inc. ("Microsoft") is a worldwide leader in computer technology and online services. Microsoft develops, manufactures, licenses, and supports a wide range of consumer and enterprise products and services, including online services such as OneDrive, Azure, Outlook, Office365, Xbox Live, and the Bing search engine. Microsoft's mission is to enable individuals and businesses throughout the world to realize their full potential by creating technology that transforms the way people work, play, and communicate.

*Amici* rely on the DMCA safe harbors in many different aspects of their business. They provide services that host material uploaded at the direction of their users, which are presumptively protected by § 512(c). *Amici* also operate internet search engines that refer or "link" users to other online locations, an activity protected by a separate DMCA

safe harbor, § 512(d). For more than a decade, *amici* have structured their operations based on these safe harbors. Among other things, they have invested tens of millions of dollars to develop tools, processes, and technology to enable copyright owners to quickly and efficiently report and remove infringing materials. They have also partnered with rights-owners and other intermediaries to establish best practices and principles to reduce the likelihood that their services are misused to infringe copyright.[2] *Amici* thus have an overriding interest in ensuring that the DMCA's balancing of responsibility among rights-owners and online providers remains as Congress intended.

## SUMMARY OF ARGUMENT

*Amici* file this brief to address two key questions about the DMCA: (1) what does it take for an online service provider to acquire "red-flag" knowledge of infringement; and (2) does the common-law doctrine of "willful blindness" erode the fundamental rule that the DMCA's knowledge provisions require item-specific knowledge? These ques-

[2] *See, e.g.*, *Principles for User Generated Content Services*, *available at* http://www.ugcprinciples.com (statement of principles by major technology and entertainment companies, including voluntary commitment to deploy copyright enforcement tools); Office of Mgmt. and Budget, The White House, "Coming Together to Combat Online Piracy and Counterfeiting" (July 15, 2013), *available at* http://www.whitehouse.gov/blog/2013/07/15/coming-together-combat-online-piracy-and-counterfeiting (statement by leading online ad networks of best practices to address online infringement by reducing the flow of ad revenue to operators of sites engaged in significant piracy and counterfeiting)

tions are answered by the statute, its legislative history, and this Court's decision in *Viacom International, Inc. v. YouTube, Inc.*, 676 F.3d 19 (2d Cir. 2012).[3]

**Red-Flag Knowledge.** The DMCA imposes a narrow standard for red-flag knowledge. To be disqualified for safe-harbor protection under this statute, a service provider must be aware of facts that would make the infringing nature of the material immediately obvious. This narrow standard reflects the difficulty a service provider has in determining possible infringement of user-submitted content.

Online service providers like *amici* host many billions of items posted by its professional and consumer users, encompassing a huge variety of content from all over the globe, and authored by creators large and small, the vast majority of which does not infringe anyone's copyrights. Employees of *amici* may be located in Dublin, Hyderabad, or Seattle, and are not in a position to make complicated judgments about copyright infringement. They have limited, if any, information about the facts most relevant to determining whether something is infringing, including whether the work is licensed or otherwise authorized to be where it is.

Given that, red-flag knowledge is properly reserved for circumstances where there can be no reasonable doubt that the material at issue is infringing. This approach is

[3] *Amici* do not here express a view regarding the third question certified by the Court for interlocutory review—the applicability of the DMCA safe harbors to pre-1972 sound recordings—but note that industry associations in which several of *amici* are members will be addressing this issue in a separate filing.

needed so as not "to discourage the service provider from monitoring its service." H.R Rep. No. 105-796, at 73 (1998), *reprinted in* 1988 U.S.C.C.A.N. 639, 649 (Conf. Rep.). *Amici* engage in responsible review of user-submitted content for reasons that benefit their users and society at large. Employees may be looking for pornography, child sexual abuse imagery, or other unambiguous violations of the service's governing rules, in some cases at the requests of their users. The monitoring work that these employees do is invaluable to protecting internet users and preventing unlawful and unsavory activities online. The DMCA's carefully crafted knowledge standards give them sufficient protection to monitor content without fear of losing safe-harbor protection if such content turns out to infringe a copyright.

**Willful Blindness.** The district court's application of the willful-blindness standard in this case follows directly from this Court's decision in *Viacom*, the structure of the DMCA, and Congress's decision not to require online services to patrol their platforms for possible instances of infringement. Congress recognized that innovation and investment would be chilled if service providers were made liable without *specific* notice or awareness of infringement. Any broader application of willful blindness would frustrate the intent of Congress, throw the highly successful DMCA regime into confusion, and impose undue burdens on online services.

## ARGUMENT

### I. Proper Application Of "Red-Flag" Knowledge Is Vital To The Operation Of The DMCA Regime.

The DMCA's "red-flag" knowledge provision is a deliberately narrow standard. Congress intended it that way to avoid placing burdens on service providers to make unilateral judgments about potential infringement when interacting with third-party content.

#### A. For Good Reason, Congress Intended The Red-Flag Knowledge Provision To Apply Only In Limited Circumstances.

The DMCA is designed to "place the burden of policing copyright infringement—identifying the potentially infringing material and adequately documenting infringement—squarely on the owners of the copyright." *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 113 (9th Cir. 2007). Copyright owners are best situated to identify their works, assess the use in question, and determine whether such use is infringing.

Accordingly, a service provider's obligation to remove material without having received a takedown notice arises in two very limited situations: (a) where it has "actual knowledge" that such material is infringing; and (b) where it is "aware of facts or circumstances from which infringing activity is apparent." 17 U.S.C. § 512(c)(1)(A)(i)-(ii). General awareness of rampant infringement is not enough to disqualify a service provider from protection. *See Viacom Int'l Inc. v. YouTube, Inc.*, 718 F. Supp. 2d 514, 524 (S.D.N.Y. 2010, *aff'd in part, vacated in part, remanded by* 676 F.3d 19 (2d Cir. 2012); *see also UMG Re-*

*cordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1021-23 (9th Cir. 2013); *Capitol Records, Inc. v. MP3tunes, LLC*, 821 F. Supp. 2d 627, 644 (S.D.N.Y. 2011).

Congress crafted a "high bar for finding 'red flag' knowledge." *UMG Recordings, Inc. v. Veoh Networks, Inc.*, 665 F. Supp. 2d 1099, 1111 (C.D. Cal. 2009). "Red flags" exist only where the service provider is actually aware of facts or circumstances that make the infringing activity "obvious" to any reasonable person. *Viacom*, 718 F. Supp. 2d at 522 (quoting S. Rep. No. 105-190 at 48 (1998) (service provider must have "turned a blind eye to 'red flags' of obvious infringement")); *see also Veoh*, 665 F. Supp. 2d at 1108 ("it takes willful ignorance of readily apparent infringement to find a 'red flag'"); *Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1108 (W.D. Wash. 2004) (the question is "whether the service provider deliberately proceeded in the face of blatant factors of which it was aware" (citation omitted)).

Red-flag knowledge is not an "inquiry notice" standard, and the DMCA imposes no "investigative duties" on service providers to decide in the face of uncertainty whether something is infringing. *CCBill*, 488 F.3d at 1114. "[I]f investigation of 'facts and circumstances' is required to identify material as infringing, then those facts and circumstances are not 'red flags.'" *Veoh,* 665 F. Supp. 2d at 1108 (citation omitted).

Congress understood that it was necessary to avoid imposing on service providers the burden to make "discriminating judgments about potential copyright infringement."

H.R. Rep. No. 105-551(II), at 58 (1998). Assessing whether a given video, image, song, or text is infringing requires background knowledge about, among other things, whether the item is protected by copyright, who owns the relevant copyrights, who posted the item, the poster's relationship with the rights-holder(s), whether one of the copyright owners licensed or otherwise approves of the use of the content, and whether that use is fair or otherwise permitted by law. Service providers have limited, if any, information about any of these issues. They "cannot by inspection determine whether the use has been licensed by the owner, or whether its posting is a 'fair use' of the material, or even whether its copyright owner or licensee objects to its posting." *Viacom,* 718 F. Supp. 2d at 524.

The DMCA removes any requirement that providers monitor their services for infringement, *see* 17 U.S.C. § 512(m), and puts the burden of identifying online infringement on copyright holders, *see Shelter Capital*, 718 F.3d at 1023; *CCBill*, 488 F.3d at 1114. Congress so apportioned these burdens to eliminate any suggestion that online services "must investigate possible infringements, monitor [their] service, or make difficult judgments as to whether conduct is or is not infringing." S. Rep. No. 105-190, at 61 (1998).

## B. Online Services Cannot Practically Determine Infringement Without Knowledge of Specific Facts.

The district court below refused to grant summary judgment to Vimeo with respect to 18 videos because the videos contained "well-known songs" that were played "in

their entirety." Order Certifying for Interlocutory Appeal at 11. This approach distorts the red-flag standard. Employees reviewing content cannot determine infringement based only on the popularity or length of content, especially given the reach of today's global internet services. The DMCA recognizes this, and thus its application does not turn on assumptions about whether copyrighted works are "well known."

Service providers like *amici* are global operations. Their users post materials from nearly every country, in every language imaginable, referencing culture, art, politics, and news from around the world. Their workforces are also global, with content reviewers and other employees located worldwide. Works that may be familiar to employees in California may not be familiar to those in Singapore or Hyderabad.[4] Employees may also interact with items that are culturally unfamiliar and obscure, more so given the sheer diversity of user-submitted content.

Moreover, "well known" does not equate to "obviously infringing." Major copyright owners (movie studios, television networks, and record labels) authorize their works to appear on online services for a variety of purposes, including promotional purposes, frequently without formal licensing arrangements. Copyright owners are often fully aware that their works are available on user-submitted content services, but deliberately

[4] Nor can the appearance of "professional production" stand in for "well known." Today, videos and music produced by amateurs are frequently indistinguishable from those produced by professionals.

refrain from sending takedown notices because they want to reap the promotional benefits that come from having their content widely available.[5] Courts have rightly found that these practices can dispel a finding of red-flag knowledge. *See Veoh*, 665 F. Supp. 2d at 1110 & n.13. In situations like these, an online service provider cannot know, simply because it sees or hears professional media content (even a well-known work) that it is looking at obvious copyright infringement.

Consider the example of Disney's global smash-hit movie, *Frozen*, and its accompanying soundtrack. According to the *Wall Street Journal*, "[t]here are about 60,000 fan-made versions of 'Let It Go' alone, and they've been viewed more than 60 million times."[6] The online phenomenon has fed the gift-buying and impulse purchases that drive the soundtrack's continued sales, says Ken Bunt, president of Disney Music Group."[7] And those fan-made versions frequently contain the entirety of this now-famous song, often set to original video content. The YouTube video entitled "[MMD]

---

[5] The record developed by Google in the *Viacom v. YouTube* litigation amply demonstrates these marketing activities by major media companies. *See* Br. for Defs.-Appellees, *Viacom v. Youtube*, Nos. 10-cv-3270 & 10-3342, 2011 WL 1356930, at *44-53 (2d Cir. Mar. 31, 2011); Br. for Defs.-Appellees, *Viacom v. Youtube*, No. 13-cv-1720, 2013 WL 5870383, at *13-14 (2d Cir. Oct. 25, 2013).

[6] John Jurgensen, "'Let It Go' and 'Frozen' Soundtrack Keep On Going," Wall St. J. (May 15, 2014), *available at* http://online.wsj.com/news/articles/SB10001424052702303409004579563923915472580.

[7] *Id.*

Disney's Frozen 'Let It Go'—Idina Menzel—[Animation],"[8] for example, has been viewed more than one million times and sets the entire song against an original animation that looks very much like something taken from the film. In light of these realities, how would an employee based in Bangalore or Singapore who is reviewing that video for non-copyright reasons be expected to know if the video is infringing?[9]

For much the same reason, courts applying the red-flag knowledge provision should be particularly sensitive to the problems created by fair use. Users of online services often draw on well-known works to create new works. These range from fan fiction, tributes, parodies, remixes, reviews, analyses, memes, and mash-ups. *See, e.g.*, http://knowyourmeme.com/memes/downfall-hitler-reacts (describing a series of viral videos posted to YouTube adding funny new subtitles to a clip from the film *Downfall*); http://www.billboard.com/articles/news/1549748/baauers-harlem-shake-billboard-cover-story (describing how homemade YouTube videos set to the track "Harlem Shake" helped launch the song to No. 1 on the Billboard chart). These types of user-submitted

[8] *Available at* https://www.youtube.com/watch?v=wKNq1Cm69LI.

[9] Frequently, owners of well-known content permit their users to copy content and distribute on social media. In the video game industry, users customarily post videos depicting "playthroughs" of their video game exploits, and dubbing in commentary, and this activity is encouraged by video game makers. *See, e.g.*, http://forums.ubi.com/showthread.php/773564-Ubisoft-policy-on-YouTube-videos-Forums (Ubisoft's video policy); http://us.blizzard.com/en-us/company/legal/videopolicy.html ("Blizzard Entertainment strongly supports the efforts of its community members who produce community videos").

items—including the so-called "lip dubs" at issue in this case—can raise substantial questions of fair use that have not been previously addressed in published rulings. And because a fair use is not an infringement of copyright, *see* 17 U.S.C. § 107, any user-submitted item that could plausibly be considered a fair use cannot be sufficiently obvious to be a red flag.

These practical considerations—the global scale of online services, the prevalence of authorized and tolerated uses of well-known works, and the lack of clear legal guidance regarding the scope of fair use as applied to new forms of user-generated remix expression—confirm Congress's wisdom in crafting a red-flag knowledge provision designed to protect service providers from having to make judgment calls about infringement in the face of inadequate information.

### C. A Loose Red-Flag Knowledge Standard Would Chill Moderation Of Harmful Online Content.

Responsible online services often have important reasons to interact with, moderate, or review user-submitted content in ways that have nothing to do with policing for copyright infringement. Many services ban pornography, for example, as well as other kinds of offensive or objectionable material, such as excessively violent content, animal abuse, bullying, stalking, "spam" (material with misleading descriptions designed to deceive users into clicking on it), content containing spyware or malware, and images of child abuse. *See, e.g.*, YouTube Community Guidelines, *available at*

https://www.youtube.com/t/community_guidelines; Xbox Live Code of Conduct, *available at* http://www.xbox.com/en-US/legal/codeofconduct; Facebook Community Standards, *available at* https://www.facebook.com/communitystandards; Flickr Community Guidelines, *available at* https://www.flickr.com/guidelines.gne.

To enforce these standards, service providers often rely on human reviewers to look at materials that have been flagged (either by users or by internal algorithmic means) as potentially inappropriate. These reviewers may look at thousands of pieces of content each week and must quickly determine whether something they are looking at violates the service's content policies. In contrast to prohibitions on infringing material, these restrictions can be enforced simply by looking at user-posted material on the service. No background knowledge about the item or the circumstances under which it was posted is generally required. A quick glance at a video or photograph is often sufficient to see that it is pornographic, unduly violent, or yet another "spam" come-on. And there is no such thing as "authorization" or "fair use" when it comes to child sexual abuse imagery. Not so with copyright infringement, as discussed above.

These review efforts serve an important function: they help ensure that people of all ages and backgrounds can have a good experience on the service provider's site; that the service will not be overwhelmed by inappropriate or harmful content; and that online services are not being subverted by those intent on unlawful activity. In other cases, ser-

vices may be devoted to specific types of content (such as real-estate listings), and manual review helps ensure that only material relevant to that subject is posted. *See, e.g.*, *CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d 544, 547 (4th Cir. 2004) (describing review undertaken by real-estate listings website).

The approach to red-flag knowledge adopted by the district court in this case, which turned on whether the work was "well known" or "popular," would put these review efforts at risk by potentially chilling incentives that service providers have to review and moderate harmful content. This is not what Congress wanted.[10] Service providers depend on the red-flag standards to allow them to address the problems created by offensive or unsafe content, without fear that they will lose their safe harbor whenever an employee comes across an item of user-submitted content that later turns out to be infringing.

Without those protections, providers might have to rethink how and under what circumstances they moderate their services for harmful content. Alternatively, they would have to err on the side of over-removal, which would harm numerous third parties who have done nothing wrong. Users who have created new and expressive works that are legitimate and unobjectionable—whether because the content is original, or because

[10] Although the DMCA explicitly relieves service providers of any obligation to monitor for copyright infringements, *see* 17 U.S.C. § 512(m), Congress in separate legislation established its intention to clear the way for service providers to make *voluntary* efforts to limit other kinds of antisocial behavior, *see* 47 U.S.C. § 230(c).

they have obtained permission to use other people's works, or because the rights-holder is happy to have the content available for promotional value, or because they have properly relied on fair use—might nevertheless find their creations blocked or removed. *See Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724, 747 (S.D.N.Y. 2012) ("a policy under which Photobucket assumes infringement could result in Photobucket unlawfully blocking others from uploading images to which they hold valid licenses"), *aff'd sub nom.*, *Wolk v. Photobucket.com, Inc.*, No. 12-cv-420, 2014 WL 2723035 (2d Cir. June 17, 2014). Congress intended otherwise. *See, e.g.*, 144 Cong. Rec. H7092 (daily ed. Aug. 4, 1998) (statement of Rep. Frank) (explaining that the DMCA was balanced to protect copyright owners "in a way that will not give to the people in the business of running the online service entities … either an incentive or an excuse to censor").

The Court should take this opportunity to correct the mistaken red-flag knowledge standard enunciated by the district court, lest that standard undermine the legitimate, socially desirable efforts of online services to foster creativity and protect the public good.

## II. The District Court Correctly Held That The Willful-Blindness Doctrine Cannot Be Used To Evade The DMCA's Specific Knowledge Requirements.

This Court held in *Viacom* that the DMCA "limits" the common-law willful-blindness doctrine; the doctrine "may be applied, in appropriate circumstances, to demonstrate knowledge or awareness of *specific instances of infringement* under the DMCA." 676 F.3d at 35 (emphasis added). As the court below recognized, willful blindness, like

all other kinds of knowledge under the DMCA, requires a showing linked to the particular infringing material at issue. *Capital Records, LLC v. Vimeo, LLC*, 972 F. Supp. 2d 500, 524 (S.D.N.Y. 2013). That ruling was correct and should be affirmed.

As applied in the DMCA's statutory context, willful blindness plays a narrow role and certainly is not an alternative form of generalized knowledge. A "court can properly find willful blindness only where it can almost be said that the defendant actually knew'" the "critical facts." *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2070-71 (2011) (quoting G. WILLIAMS, CRIMINAL LAW § 57, at 159 (2d ed. 1961)). Willful blindness in the DMCA context is simply an alternative way for a plaintiff to prove the knowledge of "specific and identifiable instances of infringement" that the statute requires. *Viacom*, 676 F.3d at 32; *see also Shelter Capital*, 718 F.3d at 1023 (rejecting willful-blindness claim because "the DMCA recognizes that service providers who do not locate and remove infringing materials they do not *specifically* know of should not suffer the loss of safe harbor protection" (emphasis added)); *Viacom Int'l Inc. v. YouTube, Inc.*, 940 F. Supp. 2d 110, 115-17 (S.D.N.Y. 2013) (same).

This Court set out the right willful-blindness test: a "person is 'willfully blind' or engages in 'conscious avoidance' amounting to knowledge where the person 'was aware of a high probability *of the fact in dispute* and consciously avoided confirming that fact.'" *Viacom*, 676 F.3d at 35 (emphasis added) (internal quotation marks omitted) (quoting

*United States v. Aina-Marshall*, 336 F.3d 167, 170 (2d Cir. 2003)). The "fact in dispute" for present purposes is whether specific and identifiable material on a service provider's system was infringing. *Id.* at 32. To overcome DMCA protection through a claim of willful blindness, therefore, a plaintiff must show that the service provider (1) was actually aware of a "high probability" that some specific and identifiable material was infringing, and (2) made an "active effort[]" to deliberately avoid confirming that fact. *Global-Tech*, 131 S. Ct. at 2070-71. The court in this case was thus right when it held that "just as the knowledge prong of § 512(c) may be met only where the plaintiff is able to prove actual or red-flag knowledge as to the specific infringing content at issue in the litigation, so too must proof of willful blindness be tailored to that same infringing content." *Vimeo,* 972 F. Supp. 2d at 524-25 (internal citation omitted).

The plaintiffs here have argued for a far more expansive application of willful blindness: once a service provider is aware of a high probability of (unspecified) infringement occurring on its service, they believe the service provider should be charged with willful blindness unless it takes steps to seek out and stop that activity. This approach is at odds with this Court's principle in *Viacom* that, "to mandate an amorphous obligation to 'take commercially reasonable steps' in response to a generalized awareness of infringement . . . cannot be reconciled with the language of the statute." *Viacom*, 676 F.3d at 30-31; *see also Shelter Capital*, 718 F.3d at 1024 (explaining that if a provider's "ac-

knowledgment" of the general problem of infringement on its service "was enough to remove a service provider from DMCA safe harbor eligibility, the notice and takedown procedures would make little sense and the safe harbors would be effectively nullified").

Were plaintiffs' standard to prevail, a service provider could be charged with knowledge of every allegedly infringing item on its services, despite being unaware of any specific information identifying particular items as infringing. But this Court understood that the DMCA's knowledge standard was intentionally "incompatible with a broad common law duty to monitor or otherwise seek out infringing activity based on general awareness that infringement may be occurring." *Viacom,* 676 F.3d at 35. Instead, the DMCA "limits" willful blindness by requiring a showing that a service provider was aware of a high probability that some *particular* material was infringing but deliberately acted to avoid confirming that fact. *Id.* Willful blindness cannot be used to force service providers to make difficult judgments about whether a given item is infringing, and a service provider's safe-harbor eligibility can never be premised on a requirement to seek out infringing material in response to a provider's general awareness that such material may exist somewhere on its service.

## III. Expanding Red-Flag Knowledge Or Willful Blindness Would Undermine The DMCA's Goal Of Stimulating Online Investment And Innovation.

*Amici* provide platforms for hundreds of millions of users to contribute their voices to a global conversation. They have transformed the way people access information,

buy goods and services, conduct business, forge social relationships, and discuss matters of public and private concern. Without the protections afforded by the DMCA safe harbors, those services might never have launched in the first place.

While the vast majority of what users contribute to *amicis'* services is lawful, a small minority of users, wittingly or unwittingly, will use the freedom offered to them to infringe copyright. Congress foresaw that without robust safe-harbor protection, the possibility that service providers might be held liable for their users' mistakes could hamper the continued development of the Internet. *See* H.R. Rep. No. 105-551(II), at 49-50 (1998) (explaining that the DMCA was intended to provide "greater certainty to service providers concerning their legal exposure for infringements that may occur in the course of their activities"); S. Rep. No. 105-190, at 8 (1998) ("without clarification of their liability, service providers may hesitate to make the necessary investment in the expansion of the speed and capacity of the Internet").

The DMCA has worked; it gives service providers the legal certainty they need in their everyday activities and it encourages them to invest in tools and processes to aid rights-holders in reporting and removing any infringing materials found on their services. The DMCA has encouraged the development of new, innovative services and stimulated investment in legitimate online services. As Congress intended, the carefully crafted safe harbors have helped facilitate the development of the Internet as a robust platform for

creative expression and economic opportunity. The DMCA's strict standard for red-flag knowledge and its insistence on item-specific awareness of infringement are integral parts of that scheme. Attempts to broaden red-flag knowledge and willful blindness undermine those benefits and cloud the legal certainty that Congress meant to create.

## CONCLUSION

For these reasons, *amici* encourage the Court to preserve the DMCA's strict standards for red-flag knowledge and willful blindness to facilitate Congress's goal of fostering the growth of online services and thereby allowing creativity and free expression to flourish on the Internet.

Dated: New York, N.Y.
July 30, 2014

MAYER BROWN LLP

/S/ A. John P. Mancini
A. John P. Mancini
1675 Broadway
New York, NY 10019
(212) 506-2295

*Counsel for Google Inc. and Facebook, Inc.*

Robert Turner
Legal Director
YAHOO!, INC.
701 First Ave.
Sunnyvale, CA 94089
(408) 349-3878

*Counsel for Yahoo!, Inc.*

Michael Elkin
Thomas P. Lane
WINSTON & STRAWN LLP
200 Park Ave.
New York, NY 10166
(212) 294-6700

*Counsel for Microsoft, Inc.*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(d) and 32(a)(7)(B) because this brief contains 4655 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in fourteen point font Garamond.

/S/ A. John P. Mancini
A. John P. Mancini
MAYER BROWN LLP
1675 Broadway
New York, NY 10019
(212) 506-2295