# FINAL FORM

# 14-1048-cv(L)

## 14-1049-cv(CON), 14-1067-cv(XAP), 14-1068-cv(XAP)

IN THE

# United States Court of Appeals

### FOR THE SECOND CIRCUIT



CAPITOL RECORDS, LLC, a Delaware Limited Liability Company, CAROLINE RECORDS, INC., a New York Corporation, VIRGIN RECORDS AMERICA, INC., a California Corporation, EMI BLACKWOOD MUSIC, INC., a Connecticut Corporation, EMI APRIL MUSIC, INC., a Connecticut Corporation, EMI VIRGIN MUSIC, INC., a New York Corporation, COLGEMS-EMI MUSIC, INC., a Delaware Corporation, EMI VIRGIN SONGS, INC., a New York Corporation, EMI GOLD HORIZON MUSIC CORP., a New York Corporation, EMI UNART CATALOG INC., a New York Corporation, STONE DIAMOND

*(Additional Caption on the Reverse)*

---

*On Appeal from the United States District Court*
*for the Southern District of New York (New York City)*

---

## RESPONSE AND REPLY BRIEF FOR
## DEFENDANTS-APPELLANTS-CROSS-APPELLEES

---

Michael A. Cheah
VIMEO, LLC
555 West 18th Street
New York, New York 10011
212-314-7457

Kathleen M. Sullivan
Robert L. Raskopf
Todd Anten
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
212-849-7000

Rachel Herrick Kassabian
QUINN EMANUEL URQUHART & SULLIVAN, LLP
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065
650-801-5000

*Attorneys for Defendants-Appellants-Cross-Appellees*

Music Corporation, a Michigan Corporation, EMI U Catalog, Inc., a New York Corporation, Jobete Music Co., Inc., a Michigan Corporation,

*Plaintiffs-Appellees-Cross-Appellants,*

*v.*

Vimeo, LLC, a Delaware Limited Liability Company, a/k/a Vimeo.com, Connected Ventures, LLC, a Delaware Limited Liability Company,

*Defendants-Appellants-Cross-Appellees,*

*and*

Does, 1-20 inclusive,

*Defendants.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................... iii

PRELIMINARY STATEMENT ................................................................1

ARGUMENT ..........................................................................................4

I.    PLAINTIFFS FAIL TO SHOW HOW MERE AWARENESS OF THE PRESENCE OF A RECOGNIZABLE SONG IN AN ORIGINAL VIDEO CAN CONSTITUTE "RED FLAG" KNOWLEDGE OF COPYRIGHT INFRINGEMENT ..................................4

    A.    Plaintiffs Bear The Burden Of Identifying Evidence Of "Red Flag" Knowledge.................................................................................5

    B.    A Service Provider's Mere Awareness Of The Presence Of Recognizable Songs In Original Works Cannot Render A Use "Obviously" Infringing ........................................................................8

    C.    Plaintiffs Fail To Cite Evidence Of "Obviously" Infringing Use.......13

    D.    No Putative Infringement Can Be "Obvious" Where A Plausible Fair-Use Or License Defense Is Available..........................15

    E.    Plaintiffs Offer No Solution To The Practical Problems Flowing From The District Court's "Red Flag" Rule........................22

II.    PLAINTIFFS CANNOT REFUTE THE DISTRICT COURT'S CORRECT DETERMINATION THAT VIMEO WAS NOT WILLFULLY BLIND TO INFRINGING CONTENT IN ANY OF THE VIDEOS-IN-SUIT ................................................................24

    A.    Plaintiffs Fail To Identify Evidence Of Vimeo's Willful Blindness As To The Specific Videos-In-Suit, As The DMCA Requires.............................................................................................25

    B.    Plaintiffs' Purported Evidence Of Vimeo's General Policies Cannot Establish Willful Blindness As To The 199 Videos-In-Suit.......................................................................................29

III.   PLAINTIFFS FAIL TO DEMONSTRATE THAT CLAIMS BASED UPON PRE-1972 SOUND RECORDINGS FALL OUTSIDE THE DMCA SAFE-HARBOR PROVISIONS ...................................................37

    A.   The Text, Structure, And Purpose Of The DMCA Confirm That The Safe Harbors Apply To All Copyright Claims ............................38

        1.   The Plain Text Of § 512(c) Includes State-Law Copyright Claims Within Its Scope ...........................................38

        2.   The Structure Of The Copyright Act Confirms That The Safe Harbors Apply To Claims Based On Pre-1972 Sound Recordings ....................................................42

        3.   Plaintiffs Do Not Dispute That Excluding Claims Based On Pre-1972 Sound Recordings From Safe Harbor Would Undermine The DMCA .................................46

    B.   Plaintiffs Are Incorrect That § 301(c) Excludes Claims Based On Pre-1972 Sound Recordings From Safe Harbor ............................49

        1.   Congress Did Not Intend That § 301(c) Preclude All Future Regulation Of Pre-1972 Sound Recordings, And It Is Thus Compatible With § 512(c) .........................................50

        2.   Contrary to Plaintiffs' Assertion, The DMCA Does Not "Annul" Or "Limit" Any State Right Or Remedy Relating To Pre-1972 Sound Recordings ..................................52

CONCLUSION .........................................................................................55

CERTIFICATE OF COMPLIANCE WITH RULE 32(A) ....................................57

# TABLE OF AUTHORITIES

## Cases

*Agee v. Paramount Comm'cns, Inc.*,
   59 F.3d 317 (2d Cir. 1995) ...................................................................18

*In re Aimster Copyright Litigation*,
   334 F.3d 643 (7th Cir. 2003) ..........................................................34, 35

*Am. Library Ass'n v. FCC*,
   406 F.3d 689 (D.C. Cir. 2005)...............................................................45

*Arista Records LLC v. Lime Group LLC*,
   715 F. Supp. 2d 481 (S.D.N.Y. 2010) ...................................................54

*Authors Guild, Inc. v. HathiTrust*,
   755 F.3d 87 (2d Cir. 2014) .....................................................................18

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
   448 F.3d 605 (2d Cir. 2006) ...................................................................18

*Campbell v. Acuff-Rose Music, Inc.*,
   510 U.S. 569 (1994).........................................................................18, 20

*Capitol Records, Inc. v. MP3tunes, LLC*,
   821 F. Supp. 2d 627 (S.D.N.Y. 2011) ...............3, 38, 39, 47, 50, 52

*Capitol Records, Inc. v. MP3tunes, LLC*,
   No. 07-cv-9931, 2014 WL 4851719 (S.D.N.Y. Sept. 29, 2014).................27, 32

*Cariou v. Prince*,
   714 F.3d 694 (2d Cir. 2013) .........................................................17, 18, 19

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986).................................................................................8

*Columbia Pictures Indus., Inc. v. Fung*,
   710 F.3d 1020 (9th Cir. 2013) .........................................................12, 16

*Computer Assocs. Int'l, Inc. v. Altai, Inc.*,
   982 F.2d 693 (2d Cir. 1992) ...................................................................46

*Conboy v. AT&T Corp.*,
   241 F.3d 242 (2d Cir. 2001) ...................................................................44

*Corbis Corp. v. Amazon.com, Inc.*,
   351 F. Supp. 2d 1090 (W.D. Wash. 2004) ............................................7

*Firth v. State*,
   775 N.E.2d 463 (N.Y. 2002)..................................................................54

*Gallo v. Prudential Residential Servs., L.P.*,
22 F.3d 1219 (2d Cir. 1994) .......................................................................7

*Global-Tech. Appliances, Inc. v. SEB S.A.*,
131 S. Ct. 2060 (2011) ..............................................................................29

*In re Halpin*,
566 F.3d 286 (2d Cir. 2009) .....................................................................38

*Hedges v. Obama*,
724 F.3d 170 (2d Cir. 2013) .....................................................................38

*Hendrickson v. Amazon.com, Inc.*,
298 F. Supp. 2d 914 (C.D. Cal. 2003) .....................................................10

*INS v. Cardoza-Fonseca*,
480 U.S. 421 (1987)...................................................................................44

*Kirtsaeng v. John Wiley & Sons, Inc.*,
133 S. Ct. 1351 (2013) ..............................................................................43

*Leadsinger, Inc. v. BMG Music Pub.*,
512 F.3d 522 (9th Cir. 2008) ....................................................................18

*Lennon v. Premise Media Corp.*,
556 F. Supp. 2d 310 (S.D.N.Y. 2008) ......................................................19

*Licci v. Lebanese Canadian Bank, SAL*,
739 F.3d 45 (2d Cir. 2013) .......................................................................54

*Lunney v. Prodigy Servs.*,
723 N.E.2d 539 (N.Y. 1999).....................................................................54

*Maverick Boat Co. v. Am. Marine Holdings, Inc.*,
418 F.3d 1186 (11th Cir. 2005) ................................................................39

*Microsoft Corp. v. i4i Ltd. P'ship*,
131 S. Ct. 2238 (2011) ..............................................................................38

*Morris v. Bus. Concepts, Inc.*,
283 F.3d 502 (2d Cir. 2002) .....................................................................40

*Obodai v. Demand Media, Inc.*,
No. 11-cv-2503, 2012 WL 2189740 (S.D.N.Y. June 13, 2012), *aff'd sub nom.*
*Obodai v. Cracked Entm't Inc.*, 522 F. App'x 41 (2d Cir. 2013).........................7

*Perfect 10, Inc. v. CCBill LLC*,
488 F.3d 1102 (9th Cir. 2007) ..........................................................6, 9, 34

*Price Trucking Corp. v. Norampac Indus., Inc.*,
748 F.3d 75 (2d Cir. 2014) .......................................................................48

*SEC v. DiBella*,
587 F.3d 553 (2d Cir. 2009) .....................................................................49

*Seltzer v. Green Day, Inc.*,
    725 F.3d 1170 (9th Cir. 2013) ........................................................... 17

*Sony Corp. of America, Inc. v. Universal City Studios, Inc.*,
    464 U.S. 417 (1984) ........................................................................... 35

*Tiffany (NJ) Inc. v. eBay, Inc.*,
    600 F.3d 93 (2d Cir. 2010) ......................................................... 34, 36

*UMG Recordings, Inc. v. Escape Media Group, Inc.*,
    964 N.Y.S.2d 106 (1st Dep't 2013) ...................................... 51, 53, 54

*UMG Recordings, Inc. v. Shelter Capital Partners LLC*,
    718 F.3d 1006 (9th Cir. 2013) ......................... 6, 14, 22, 26, 34

*UMG Recordings Inc. v. Veoh Networks Inc.*,
    665 F. Supp. 2d 1099 (C.D. Cal. 2009) .................................... 4, 34

*United States v. Aina-Marshall*,
    336 F.3d 167 (2d Cir. 2003) ............................................................. 25

*United States v. Mitchell*,
    328 F.3d 77 (2d Cir. 2003) ............................................................... 50

*United States v. Winstar Corp.*,
    518 U.S. 839 (1996) ........................................................................... 50

*Utility Air Regulatory Group v. EPA*,
    134 S. Ct. 2427 (2014) ...................................................................... 42

*Viacom Int'l, Inc. v. YouTube, Inc.*,
    718 F. Supp. 2d 514 (S.D.N.Y. 2010) ............................................. 10

*Viacom Int'l, Inc. v. YouTube, Inc.*,
    676 F.3d 19 (2d Cir. 2012) ....................................................... *passim*

*Viacom Int'l, Inc. v. YouTube, Inc.*,
    940 F. Supp. 2d 110 (S.D.N.Y. 2013) ...................... 6, 27, 28, 29, 32

*WPIX, Inc. v. ivi, Inc.*,
    691 F.3d 275 (2d Cir. 2012) ............................................................. 40

*Wasser v. N.Y. State Office of Vocational & Educ. Servs.*,
    602 F.3d 476 (2d Cir. 2010) ............................................................. 10

*Whitman v. Am. Trucking Ass'n*,
    531 U.S. 457, 468 (2001) .................................................................. 46

*Yeardon v. Henry*,
    91 F.3d 370 (2d Cir. 1996) ............................................................... 52

# Statutes and Regulations

17 U.S.C. § 101 ..............................................................................39, 41, 42

17 U.S.C. § 102 ..............................................................................42

17 U.S.C. § 104 ..............................................................................42

17 U.S.C. § 105 ..............................................................................42

17 U.S.C. § 106 ..............................................................39, 41, 42, 43

17 U.S.C. § 107 ..............................................................................17, 43

17 U.S.C. § 108 ..............................................................................43

17 U.S.C. § 111 ..............................................................................40, 43

17 U.S.C. § 112 ..............................................................................43

17 U.S.C. § 121 ..............................................................................43

17 U.S.C. § 201 ..............................................................................42

17 U.S.C. § 203 ..............................................................................42

17 U.S.C. § 301(a) ..........................................................................53

17 U.S.C. § 301(c) ....................................... 3, 37, 44, 48, 49, 50, 51, 52, 54

17 U.S.C. § 501(a) ..........................................................................39, 40, 41

17 U.S.C. § 512(c) ..................... 9, 10, 21, 27, 36, 38, 40, 42, 43, 44, 48, 49, 51, 52

17 U.S.C. § 512(c)(1) ......................................................................3, 32, 37, 38

17 U.S.C. § 512(c)(1)(A) ................................................................26

17 U.S.C. § 512(c)(1)(A)(i) ............................................................25, 26

17 U.S.C. § 512(c)(1)(A)(ii) ..........................................................10, 25, 26

17 U.S.C. § 512(c)(1)(A)(iii) ..........................................................27

17 U.S.C. § 512(c)(1)(B) ................................................................54

17 U.S.C. § 512(d) ..........................................................................9, 10

17 U.S.C. § 512(d)(1)(B) ................................................................10

17 U.S.C. § 512(h)(2)(c) ................................................................44

17 U.S.C. § 512(l) ..........................................................................44

17 U.S.C. § 512(m) ............................................ 2, 23, 25, 26, 30 32, 33, 35, 36, 48

17 U.S.C. § 1008 ................................................................................42

17 U.S.C. § 1101(a) ...........................................................................44

17 U.S.C. § 1101(d) .......................................................................4, 44, 45

17 U.S.C. § 1201(a)(1)(A) ..................................................................42

17 U.S.C. § 1309 ................................................................................39

37 C.F.R. § 201.2(a)(3) .......................................................................40

## Other Authorities

H.R. Rep. No. 94-1476 (Sept. 3, 1976) ...............................................50

H.R. Rep. No. 105-551(II) (July 22, 1998)..................................9, 12, 14

H.R. Rep. No. 105-796 (Oct. 8, 1998)..................................................33

S. Rep. No. 105-190 (May 11, 1998).......... 2, 4, 8, 10, 11, 12, 16, 19, 37, 45, 47, 49

5 William F. Patry, *Patry on Copyright* § 17:102 (2014)........................40

Pub. L. 103-465, § 512 (Dec. 8, 1994) .................................................44

Pub. L. 105-304, § 202 (Oct. 28, 1998) ................................................44

*Federal Copyright Protection for Pre-1972 Sound Recordings: A Report of the Register of Copyrights* (Dec. 2011) ...................................................40

## **PRELIMINARY STATEMENT**

As their brief makes clear, plaintiff music labels and publishers want service providers like Vimeo to affirmatively monitor user-generated content and make difficult calls about potential copyright infringement rather than send a takedown notice themselves. But the DMCA was enacted to avoid imposing such duties on service providers and to spare them potentially costly liability for any misjudgment. This Court should reject Plaintiffs' contrary interpretation of the DMCA.

Specifically, Plaintiffs ask this Court to: (1) construe the DMCA's "red flag" provision to require a trial whenever a service provider merely becomes aware that a "recognizable" song was used in an otherwise original video hosted on its site; (2) ignore the Court's own recent precedent and impose "willful blindness" liability whenever a service provider has merely general knowledge that infringement has occurred on its platform; and (3) construe the DMCA to apply only to "infringement of *federal* copyright"—despite the fact that such a limitation, found nowhere in the statute's text, would undermine its purposes. This Court should reject all three invitations and instead apply the DMCA as written and enacted.

**"Red Flag" Knowledge.** Plaintiffs ask this Court to deem any original, user-uploaded video containing recognizable music as a presumptive "red flag" of

infringing activity, and therefore require Vimeo to either remove the video or face a trial whenever one of its employees merely becomes aware of the video's existence. But this Court has already held that "red flag" knowledge of infringing activity arises only in situations where the infringement is "'objectively' *obvious*"—not merely "possible." *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 31 (2d Cir. 2012) (emphasis added). The DMCA's legislative history confirms that mere awareness of the use of a "well known" work is insufficient to confer "red flag" knowledge upon a service provider, because the use might be licensed or a fair use under the law. *See* S. Rep. No. 105-190, at 48 (May 11, 1998) ("S. Rep."). To hold otherwise would compel Vimeo to make the very "discriminating judgments" about possible infringement that the "red flag" standard was designed to obviate. *Id.* at 49. Plaintiffs offer no substantive response to these authorities.

**Willful Blindness.** Plaintiffs also ask the Court to impose upon Vimeo an affirmative duty to monitor its website for the presence of their copyrighted music, arguing that Vimeo's failure to do so rendered it "willfully blind" to users' allegedly infringing uses of Plaintiffs' songs. But the DMCA expressly states that its safe harbors cannot be conditioned upon a requirement that service providers monitor their users' activities. 17 U.S.C. § 512(m). This Court has thus rejected liability based upon generalized knowledge of infringement and limited application of the willful blindness doctrine to situations where the service provider blinded

2

itself to "*specific instances* of infringement." *Viacom*, 676 F.3d at 35 (emphasis added). Thus, Plaintiffs must establish that Vimeo was "willfully blind" to alleged infringement in the 199 Videos-in-Suit—an inquiry conducted at the same level of specificity as the inquiries into actual or "red flag" knowledge of infringement. *See* SPA35. They have not met this burden: Plaintiffs do not dispute that they produced *no* evidence that Vimeo deliberately failed to investigate any of the 199 Videos-in-Suit.

**Pre-1972 Sound Recordings.** Plaintiffs do not contest that the plain language of 17 U.S.C. § 512(c)(1), which creates safe harbors "for infringement of copyright," makes no distinction between infringement claims brought under federal or state law—unlike many other provisions of the Copyright Act where Congress used the phrase "under this title" or similar language to limit a provision's scope to *federal* copyrights. Plaintiffs rely instead on the general anti-preemption provisions contained in § 301(c) of the Copyright Act of 1976 to limit a statute enacted more than two decades later. But that reliance is unavailing, for "§ 301(c) does not prohibit all subsequent regulation of pre-1972 recordings." *Capitol Records, Inc. v. MP3tunes, LLC* ("*MP3tunes*"), 821 F. Supp. 2d 627, 641 (S.D.N.Y. 2011). Nor could Congress have intended to do so; excluding such a broad swath of copyrighted works as sound recordings fixed before February 15, 1972 would eviscerate the central purpose of the DMCA by "spawn[ing] legal

uncertainty and subject[ing] otherwise innocent internet service providers to liability for the acts of third parties." *Id*. at 642. Indeed, when Congress intends to amend the Copyright Act without affecting state-law rights, it does so expressly. *See*, *e.g.*, 17 U.S.C. § 1101(d). The DMCA contains no language that would insulate pre-1972 sound recordings from its comprehensive regime.

## ARGUMENT

**I.** **PLAINTIFFS FAIL TO SHOW HOW MERE AWARENESS OF THE PRESENCE OF A RECOGNIZABLE SONG IN AN ORIGINAL VIDEO CAN CONSTITUTE "RED FLAG" KNOWLEDGE OF COPYRIGHT INFRINGEMENT**

In defending (Br. 33-52) the district court's denial of summary judgment to Vimeo based on the supposed possibility of "red flag" knowledge as to 18 Videos-in-Suit, Plaintiffs would lower the standard set by this Court's decision in *Viacom*. There, this Court held that "red flag" knowledge under the DMCA may arise only if "the provider was subjectively aware of facts that would have made the specific infringement *'objectively' obvious* to a reasonable person." *Viacom*, 676 F.3d at 31 (emphasis added); *see also* S. Rep. at 48 ("red flag" denotes knowledge of "obvious infringement"). This carefully chosen formulation reflects the fact that Congress intended to set a "high bar for finding 'red flag' knowledge." *UMG Recordings Inc. v. Veoh Networks Inc*., 665 F. Supp. 2d 1099, 1111 (C.D. Cal. 2009); *see also* Brief for *Amici Curiae* Pinterest, Tumblr, and Twitter ("Pinterest Br.") 7-10 (describing "limited role" of "red flag" knowledge in DMCA's overall

structure).  And, of course, a use cannot be "obviously" infringing if, because it is licensed or a fair use, it is not infringing at all—otherwise the "red flag" standard would require service providers to voluntarily remove from their platforms content that is entirely legal.[1]

Contrary to Plaintiffs' arguments, reversal of the district court's ruling here is required by *Viacom* and would not collapse "red flag" knowledge into actual knowledge.  Nor do Plaintiffs have a persuasive answer to Vimeo's argument that infringement cannot be objectively obvious if the use of a copyrighted musical work in an original video may not infringe in light of a plausible fair use or license defense.

## A.     Plaintiffs Bear The Burden Of Identifying Evidence Of "Red Flag" Knowledge

Plaintiffs cite no actual evidence (and there is none) that Vimeo was aware that the specific Videos-in-Suit contained "objectively obvious" infringement, but rather suggest (Br. 34-36, 44-45) that it is *Vimeo* that must come forward at summary judgment with evidence *negating* "red flag" knowledge.  That position is incorrect, for it is *Plaintiffs'* burden to adduce evidence of Vimeo's "red flag"

---

[1]   Plaintiffs ignore this requirement—calling the Videos-in-Suit the "Infringing Videos" (*e.g.*, Br. 11-12)—even though no evidence whatsoever has been presented that any of these videos is, in fact, an infringing use.

knowledge of infringing material in the Videos-in-Suit, as every court to address the issue has held.

For example, the district court on remand in *Viacom* rejected the argument that YouTube could not prevail on summary judgment because it "apparently lack[s] viewing records that could establish" the absence of "red flag" knowledge. *Viacom Int'l, Inc. v. YouTube, Inc.*, 940 F. Supp. 2d 110, 114 (S.D.N.Y. 2013) (quotation marks omitted). The court noted that the DMCA—which establishes a detailed framework for providing notices of infringements on service provider sites—already assumes that "service providers [are] generally unaware" of the materials on their platforms. *Id.* The court concluded that "the absence of record evidence" regarding YouTube's "red flag" awareness could not foreclose summary judgment for YouTube, holding:

> [T]he burden of showing that YouTube knew or was aware of the specific infringements of the works in suit cannot be shifted to YouTube to disprove. Congress has determined that the burden of identifying what must be taken down is to be on the copyright owner, a determination which has proven practicable in practice.

*Id.* at 115 (quotation marks omitted).

Similarly, the Ninth Circuit recently held that "th[e] 'red flag' test … [requires] that the burden remains with the *copyright holder* rather than the provider." *UMG Recordings, Inc. v. Shelter Capital Partners LLC* ("*Shelter Capital*"), 718 F.3d 1006, 1023 (9th Cir. 2013). Since the plaintiff could not direct

the court to any "red flag" evidence, the court affirmed summary judgment for the service provider. *Id.* at 1035; *accord*, *e.g.*, *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1114 (9th Cir. 2007) (burden on copyright holder to introduce evidence of service provider's "red flag" knowledge); *Obodai v. Demand Media, Inc.*, No. 11-cv-2503, 2012 WL 2189740, at *6-7 (S.D.N.Y. June 13, 2012) (no actual or "red flag" knowledge where "[t]here is no evidence" of such knowledge and "plaintiff directs the Court to no evidence supporting an inference" of knowledge), *aff'd sub nom. Obodai v. Cracked Entm't Inc.*, 522 F. App'x 41 (2d Cir. 2013); *Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1109 (W.D. Wash. 2004) (plaintiff "provides no evidence from which to infer that Amazon was aware of, but chose to ignore, red flags of blatant copyright infringement"); Pinterest Br. 8 n.2 (similar).

Indeed, Vimeo is not aware of a single DMCA case where the court placed the burden on the service provider to demonstrate an absence of "red flag" knowledge, as Plaintiffs insist (Br. 35) here. Nor do Plaintiffs explain how a service provider could even establish an absence of "red flag" knowledge given that the test is an "objective" one. *Viacom*, 676 F.3d at 31. Plaintiffs would have Vimeo prove a negative. But in this regard, it is well established that "the moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case," *Gallo v. Prudential Residential*

*Servs., L.P.*, 22 F.3d 1219, 1223-24 (2d Cir. 1994), and that the opposing party may not defeat summary judgment merely by demanding that the moving party produce evidence to negate the opponent's claim, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Vimeo has met its summary judgment burden here.

## B. A Service Provider's Mere Awareness Of The Presence Of Recognizable Songs In Original Works Cannot Render A Use "Obviously" Infringing

Plaintiffs acknowledge (Br. 34) *Viacom*'s limitation of "red flag" knowledge to cases where infringement is objectively "obvious," but fail to explain how a service provider should distinguish between a use of a song in an original video that is "obviously" infringing from one that is not. Thus, Plaintiffs collapse the distinction between content that is "obviously" infringing from that which is only "possibly" infringing.

Congress made clear that a specific infringement is "objectively obvious" only where its infringing nature is "apparent from even a brief and casual viewing." S. Rep. at 48. By requiring that an act of infringement be "obvious" before it can trigger secondary liability, Congress sought to ensure that service providers "would not be required to make discriminating judgments about potential copyright infringement." *Id*. at 49. The legislative history of the DMCA demonstrates that Congress recognized service providers' predicament and did not wish to burden them with tough calls:

> [A] copyright owner could show ["red flag" knowledge]
> … if the copyright owner could prove that the location
> was clearly … a "pirate" site … where sound recordings,
> software, movies or books were available …. Absent
> such "red flags" or actual knowledge, a directory
> provider *would not be similarly aware merely because it
> saw one or more well known photographs* of a celebrity
> at a site devoted to that person. The provider could not
> be expected, during the course of its brief cataloguing
> visit, to determine whether the photograph was still
> protected by copyright or was in the *public domain*; if the
> photograph was still protected by copyright, whether the
> use was *licensed*; and if the use was not licensed, whether
> it was permitted under the *fair use* doctrine.

*Id.* at 48 (emphases added). According to the Senate Report, "pirate directories" that "use words such as 'pirate,' 'bootleg,' or slang terms … to make their illegal purpose obvious" may constitute "red flags." *Id.*[2]; *see also* H.R. Rep. No. 105-551(II), at 58 (July 22, 1998) ("H.R. Rep.") ("red flag" knowledge should be imputed "only with respect to pirate sites or in similarly obvious and conspicuous circumstances, and not simply because the provider viewed an infringing site").

Plaintiffs downplay that legislative history (Br. 42-43 & n.15) as applying only to § 512(d), but that is incorrect. Congress did not "only" acknowledge "that

---

[2] Some courts have suggested that even such descriptions might be insufficient. *See*, *e.g.*, *CCBill*, 488 F.3d at 1114 (no "red flag" knowledge where service provider was aware of websites named "illegal.net" and "stolencelebritypics.com" because such words "may be an attempt to increase their salacious appeal, rather than an admission that the photographs are actually illegal or stolen. We do not place the burden of determining whether photographs are actually illegal on a service provider.").

Section 512(d) mimicked the language of Section 512(c)" (Br. 42 n.15); rather, it made clear that the "red flag" provision of § 512(d) is "*[l]ike* the information storage safe harbor in section 512(c)," S. Rep. at 48 (emphasis added).[3] Further, courts routinely cite this legislative history in applying § 512(c). *See*, *e.g.*, *Viacom Int'l, Inc. v. YouTube, Inc*., 718 F. Supp. 2d 514, 522 (S.D.N.Y. 2010), *aff'd in part, vacated in part, remanded*, 676 F.3d 19 (legislative history of § 512(d) provides an "instructive explanation" of § 512(c)'s knowledge standard); *Hendrickson v. Amazon.com, Inc.*, 298 F. Supp. 2d 914, 917 (C.D. Cal. 2003) (similar).[4]

Next, Plaintiffs fail to show how the district court's amorphous "recognizable" test could work in practice. To the extent it is based on how much

---

[3] The distinction Plaintiffs raise (Br. 42-43) between "Internet directories" that link "to a third party website" and Vimeo, which operates its "own website[],"is illusory. As Congress suggested, providers of directories can "disable the reference or link upon receiving a notification of claimed infringement," S. Rep. at 47, similarly to Vimeo removing a video.

[4] In addition, the two "red flag" provisions use *identical* language (compare § 512(c)(1)(A)(ii) with § 512(d)(1)(B)). *See Wasser v. N.Y. State Office of Vocational & Educ. Servs.*, 602 F.3d 476, 480 (2d Cir. 2010) ("[W]hen Congress uses the same language in two statutes having similar purposes it is appropriate to presume that Congress intended that text to have the same meaning in both statutes.") (alteration and quotation marks omitted). And in *Viacom*, this Court used the word "obvious" to describe "red flag" knowledge under § 512(c), 676 F.3d at 31—a word found in the same Congressional report, S. Rep. at 48— demonstrating that this Court has already applied this legislative history to § 512(c).

of the song is used in a video, how much is enough for an (alleged) infringement to be (potentially) "obvious"? To the extent it is based on how "well-known" the song is, at what point is a song sufficiently "well-known" to trigger a service provider's heightened scrutiny, and by whose measure of fame and recognition? If the information accompanying a video clip does not mention whether the creator has permission to use a song, is the service provider to assume a lack of permission? Such are the impermissible "discriminating judgments about potential copyright infringement," S. Rep. at 49, that Plaintiffs expect all Vimeo employees to make every time they come across videos containing music. But the DMCA "do[es] not place the burden of determining whether [materials] are actually illegal on a service provider." *Viacom*, 676 F.3d at 32 (quotation marks omitted) (second brackets in original).

Further, echoing concerns erroneously expressed by the district court (SPA32-33), Plaintiffs assert (Br. 39-43) that Vimeo's interpretation of the DMCA would collapse the statute's "actual knowledge" and "red flag" provisions. But Vimeo's position does nothing of the sort. To the contrary, "red flag" knowledge of "obvious" infringement can readily exist in the absence of "actual knowledge" of infringement. For example, a specific infringement may be "objectively obvious" where the infringing work is uploaded by what appears to be a user trafficking purely pirated content, as when:

- An entire, unaccompanied studio film (with a watermark) is uploaded by an individual with no apparent connection to the film;

- An entire, unaccompanied TV program (complete with commercials and the TV station's logo on the screen) is uploaded by an individual with no apparent connection to the program;

- A video consisting of nothing more than the audio of an album of full-length songs with no discernible original video content is uploaded by an individual with no apparent connection to the artist;

- A file-sharing platform allows users to exchange illegal copies of entire copyrighted works, and actively encourages infringement by urging users to upload and download particular copyrighted works. *See Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1043 (9th Cir. 2013).[5]

*See also* Vimeo Br. 20; S. Rep. at 48 (identifying "pirate directories"); H.R. Rep. at 58 ("pirate sites"). In such examples, infringement may be "apparent from a brief and casual viewing." S. Rep. at 48. By contrast, infringement is not immediately apparent where (as here) a song accompanies an original video, giving rise to a

---

[5] Such examples may or may not confer "red flag" knowledge upon those aware of them, depending on the particular circumstances. *See* Vimeo Br. 29-30 (discussing copyright owners' use of "stealth" marketing). In any event, they are far closer to the "obvious" infringement line than the uses of songs in the 18 original Videos-in-Suit before the Court.

possible fair use defense, or where the use of the song may have been licensed or otherwise permitted.

### C. Plaintiffs Fail To Cite Evidence Of "Obviously" Infringing Use

Plaintiffs identify (Br. 35-39) no facts in support of "red flag" knowledge other than certain songs' mere presence in original videos and the general industry experience of certain Vimeo staff members. Such evidence, however, is insufficient to satisfy Plaintiffs' burden of identifying a triable issue of fact as to Vimeo's knowledge of *obvious* infringement. In light of Congress's clear intent and *Viacom*'s teaching that "red flag" knowledge requires "obvious" infringement, the district court erred in ruling that "a service provider's viewing of a user-generated video containing all or virtually all of a recognizable, copyrighted song" (SPA82) forecloses summary judgment on safe harbor.[6]

The "red flag" Videos-in-Suit are 18 unrelated videos, each created by a different individual, and each containing both original visual content and a "well-known" song. The mere presence of recognizable copyrighted songs in these videos, *without more*, is insufficient to deny Vimeo summary judgment on safe

---

[6] Plaintiffs dispute (Br. 36) that the district court's order so held, but misleadingly quote a portion of the district court's order (SPA30) noting that summary judgment could not be "automatically" granted in favor of *Plaintiffs* on such a record. Plaintiffs have not cross-appealed from that ruling.

harbor.  SPA65-66.[7]  Nothing in the DMCA suggests such a result,[8] and the

committee reports state that, to the contrary, mere awareness of an apparently or

potentially infringing work *cannot* give rise to "red flag" knowledge.  *See* H.R.

Rep. at 58.  There must be something more to elevate an apparent infringement

into the realm of infringement so *obvious* that no reasonable person would believe

that the use of the copyrighted material was licensed or a fair use—but Plaintiffs

fail to identify any such additional facts.

---

[7]  Plaintiffs dispute (Br. 36-37) that the district court's order imposes such a rule.
The district court, however, expressly based its decision on its finding that "[a]ll of
the videos play, in essentially unaltered form, what a reasonable jury could deem
recognizable songs by well-known artists."  SPA66; *see also* SPA67 (because "the
videos played the songs essentially unmodified and in their entirety, and the length
of the video corresponded to the length of the song[,] … [a] jury could conclude …
that the individual users did not have permission to use the well-known songs in
their videos").  In addition, the district court certified the question of whether "a
service provider's viewing of a user-generated video containing all or virtually all
of a recognizable, copyrighted song" may give "rise to 'red flag' knowledge."
SPA82.  While Plaintiffs (*e.g.*, Br. 33, 39) and their *amici* assert that the district
court's decision was based on the "totality of the circumstances," the district
court's opinions identify no circumstances other than the presence of recognizable
copyrighted songs.

[8]  Plaintiffs assert (Br. 39) that *Viacom* held that a service provider's "awareness
of videos containing 'well-known shows' may suffice to confer actual or red flag
knowledge."  *Viacom* said nothing of the kind—rather, the decision was quoting a
YouTube employee's description of the presence of certain well-known shows on
YouTube as "blatantly illegal."  676 F.3d at 33.  The Court stated that a reasonable
juror could find that the employee *believed* the clips to be infringing and thus had
*actual* knowledge.  *Id.*  No such evidence exists here.

The mere fact that a work or an artist is "well-known" cannot overcome this failure of proof. In *Shelter Capital*, for example, Veoh's knowledge that it hosted music videos of artists such as 50 Cent, Avril Lavigne, and Britney Spears was not sufficient to give rise to "red flag" knowledge of infringement. 718 F.3d at 1023. In this case, a video posted by the band OK Go, *Plaintiffs' own artist*, containing an entire OK Go song, was originally included in Plaintiffs' list of purportedly infringing videos. A471-73 (Responses to RFAs Nos. 34, 36-38); A91. Other Vimeo users have complained when Vimeo voluntarily removed their videos, objecting that they owned or had the right to use the music in the video. *See*, *e.g.*, A955-56; A960-61; A965; A967. Such examples demonstrate that the mere appearance of a copyrighted song in an original video cannot create a triable issue as to "obvious" infringement—even where the artist is popular and the song appears in its entirety and can be easily identified. Something more is needed to cross the threshold into "red flag" knowledge. The same is true for the 18 "red flag" Videos-in-Suit here.

### D. No Putative Infringement Can Be "Obvious" Where A Plausible Fair-Use Or License Defense Is Available

Plaintiffs argue (Br. 44) that Vimeo's position "is that red flag knowledge can never exist because a service provider always can articulate an 'available' defense." That is incorrect. Vimeo does not contend that merely articulating a defense is sufficient; it has always stated that the defense must be *plausible* under

the known facts and the law. Such a conclusion follows from *Viacom*'s teaching that "red flag" knowledge is knowledge of *obvious* infringement. If there is a plausible fair-use or license defense, infringement cannot be "obvious." It also follows from the DMCA's legislative history, which states that "merely [seeing a] … well known photograph[]" cannot confer "red flag" knowledge, because "[t]he provider could not be expected … to determine," *inter alia*, "whether the use was licensed; and if the use was not licensed, whether it was permitted under the fair use doctrine." S. Rep. at 48. In contrast, as Vimeo has previously explained, it may *not* be plausible to claim fair use or license where random users trafficked in the wholesale distribution of unaltered, unaccompanied copies of copyrighted works. *See* Vimeo Br. 20 (discussing *Fung*).

Plaintiffs also incorrectly assert (Br. 44) that, to avoid being charged with "red flag" knowledge, Vimeo must affirmatively establish that a defense of fair use or license is "'available' or 'plausible.'" As discussed above, *see supra* Part I.A., copyright holders, not service providers, bear the burden of proof on "red flag" knowledge. Plaintiffs also mistake the nature of the safe-harbor inquiry, which asks not whether Vimeo can establish an affirmative defense that the 18 Videos-in-Suit are non-infringing on grounds of fair use or license,[9] but rather whether

---

[9] The absence of declarations from Vimeo staff on their subjective views of these defenses (Br. 45) is thus a red herring. The "red flag" test is objective.

Plaintiffs can establish that the alleged infringement is "objectively obvious" to a reasonable person.[10] Plaintiffs cite no evidence in the record that can satisfy that burden.

**Fair Use.** Plaintiffs do not dispute (Br. 45) that a fair use is not an infringing use. *See* 17 U.S.C. § 107. A new work is transformative—and thus lies at the heart of fair-use protection—when it uses an existing work to produce a "different aesthetic" than the original work standing alone. *Cariou v. Prince*, 714 F.3d 694, 708 (2d Cir. 2013). Protected transformation includes uses that incorporate copyrighted works *in their entirety* to convey a new meaning. *See id.* at 699, 710 ("appropriation" artist fairly incorporated entire photographs into series of paintings); *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1179 (9th Cir. 2013) (band fairly incorporated entire artwork into music video).[11] Here, the 18 supposed "red flag" Videos-in-Suit each incorporates music into an original video; the visuals "transform those [songs] into something new and different." *Cariou*, 714

---

[10] Plaintiffs draw a distinction (Br. 44) between Vimeo's defenses and its *users'* defenses. This makes no sense. While the purpose of DMCA immunity is to protect service providers from liability for the acts of their users, safe harbor *a fortiori* is available when the predicate acts themselves may not even be infringing.

[11] Although the district court apparently based its decision in large part on the appearance of songs "essentially in their entirety" in the 18 "red flag" Videos-in-Suit (SPA77), this Second and Ninth Circuit authority indicates that even such substantial appropriation does not foreclose a finding of fair use and thus is not a reliable indicator of "obvious" infringement.

F.3d at 710. At a minimum, the original visual component arguably "adds something new" to the original music, *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994), raising a substantial fair-use defense that defeats any claim that infringement is "obvious."

Plaintiffs assert (Br. 46) that Vimeo argues that "synchronizing music with video invariably is fair use." But that is incorrect; Vimeo's position is that the inclusion of a song in a creative, original video like each of the 18 Videos-in-Suit presents a *plausible* fair-use case and that this is enough to render any infringement non-"obvious" and thus not a "red flag." Plaintiffs cannot dispute that the incorporation of the entirety of an existing copyrighted work into a new work can be fair. *See*, *e.g.*, *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 97 (2d Cir. 2014); *Cariou*, 714 F.3d at 709; *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 613 (2d Cir. 2006).[12] Because in light of this authority it is certainly *plausible* that the incorporation of Plaintiffs' songs into the 18 "red flag" Videos-

---

[12] Plaintiffs cite two cases (Br. 47) for the proposition that "synchronizing a sound recording or musical composition with an audiovisual work is black-letter copyright infringement" (citing *Agee v. Paramount Comm'cns, Inc.*, 59 F.3d 317, 322 (2d Cir. 1995), and *Leadsinger, Inc. v. BMG Music Pub.*, 512 F.3d 522, 527 (9th Cir. 2008)). Neither supports Plaintiffs. *Agee* did not address fair use at all. And the fair-use inquiry in *Leadsinger* concerned the presentation of pure song lyrics (which are literary works, not musical compositions or sound recordings) on commercial karaoke machines; no transformation was asserted. 512 F.3d at 529.

in-Suit are fair uses, such uses cannot be "objectively obvious" infringements as a matter of law.

Plaintiffs' attempt (Br. 49 n.17) to distinguish the case law proves the point. Whether the incorporation of Plaintiffs' songs in the Videos-in-Suit results in "an entirely different aesthetic," *Cariou*, 714 F.3d at 706, for example, is exactly the type of "discriminating judgment[]" that Congress has made clear Vimeo should not have to make. S. Rep. at 49. Indeed, courts in this Circuit have recognized that the use of well-known songs—including "easily recognizable portion[s]"—can be fair. *See*, *e.g.*, *Lennon v. Premise Media Corp.*, 556 F. Supp. 2d 310, 326 (S.D.N.Y. 2008) (use of John Lennon song "Imagine" in film was fair). Against this legal backdrop, Plaintiffs have cited no authority that the use of an entire song in a new work is *per se* ineligible for fair use. *See also* Brief of *Amici Curiae* Electronic Frontier Foundation *et al.* ("EFF Br.") 9-13 (describing example of remixes); A992-96 (Vimeo user claims of fair use of music).

Plaintiffs' position conflicts with that adopted by Universal Music—Plaintiff recording companies' parent corporation—in the Ninth Circuit, where it protested that fair use cannot be determined by the mere "viewing" of a video containing music, Appellants' Third Brief on Cross-Appeal at 16, *Lenz v. Universal Music Corp.*, No. 13-16106(L), Dkt. 56 (9th Cir. Feb. 4, 2014), and that "[e]valuating fair use is not an 'I know it when I see it' exercise," but rather is "time consuming,

'open-ended,' and indeterminate," Appellants' First Brief on Cross-Appeal at 33-34, *id.*, Dkt. 23 (9th Cir. Oct. 9, 2013). And as noted (Vimeo Br. 28), even the RIAA finds the fair use doctrine difficult to apply—having withdrawn three DMCA notices it had issued to Vimeo in recognition of its inability to determine whether the uses at issue were or were not fair.[13] A202 (¶45); A251-54. If Plaintiffs' corporate parent and the RIAA have trouble applying the fair-use doctrine, how could the resolution of such an issue be "obvious" as to these 18 Videos-in-Suit?

**License.** Plaintiffs also do not dispute that, as noted (Vimeo Br. 28-30), there are many plausible reasons why an original video containing music might be uploaded to Vimeo with the copyright holder's permission. It is undisputed on the record here that some musicians—including Plaintiffs' artists—upload videos containing their songs on Vimeo. *See* A471-73 (Responses to RFAs Nos. 34, 36-38). It is likewise undisputed that numerous users have responded to takedown

---

[13] Contrary to RIAA's assertion in its *amicus* brief here (Br. 19 n.4), its own ambivalence does not demonstrate that Vimeo can "readily" make fair-use determinations, but rather that even the copyright holders themselves *cannot* determine by sight what is and is not "obviously" infringing. RIAA also argues (Br. 20-21) that it is "preposterous" to suggest a plausible fair-use defense here because video producers generally seek licenses when they want to use songs. That a commercial producer seeks permission, however, has no bearing on whether the non-commercial uses by individuals (as here) are fair. *Cf. Campbell*, 510 U.S. at 585 n.18 (request for license may "simply have been made in a good-faith effort to avoid this litigation").

notices with counter-notifications asserting authorization to use songs in their videos. *See* A199 (¶29), A230-49. And it is undisputed too that other users have complained after Vimeo voluntarily removed their videos, claiming they owned or had permission to use the song at issue. *See* A955-56; A960-61; A965; A967; *see generally* A948-96 (additional examples). Plaintiffs' own *amici* acknowledge that content creators frequently request and obtain licenses for use of musical works in videos like those posted on Vimeo, with license fees purportedly totaling $190 million. RIAA Br. 20-21.

Plaintiffs offer no response; rather, they claim (Br. 49) that *Vimeo* needed, but did not have, a license to use their music. This is nonsensical—§ 512(c) is concerned solely with the circumstances in which a service provider may be liable for infringing acts that may occur at the "direction" of its *users*. That presupposes that *users* can—and will—upload both infringing and non-infringing works to service providers' sites. Such activity does not somehow convert the host service provider into the user. Otherwise, the safe harbor could shelter no one. *See* EFF Br. 17 n.12 (same).

Plaintiffs also argue (Br. 50) that none of the supposed "red flag" Videos-in-Suit "bore any indicia of having been licensed." But the converse is also true: none bore any indicia that it was *not* licensed. There is no requirement, as Plaintiffs suggest (Br. 50), that licensed works bear the insignia "'with permission'

or 'courtesy of' the copyright owner."  As noted above, there is plenty of music that users are legally permitted to include in their videos, *e.g.*, music they own or have permission to use.  *See Shelter Capital*, 718 F.3d at 1021 ("there are many music videos that *could* in fact legally appear on Veoh").  This does not mean, as Plaintiffs suggest Vimeo contends (Br. 50), that *no* use of music in videos may confer "red flag" knowledge; it means only that such a video, viewed by a service provider without any information beyond the song title or artist, cannot be "obviously" infringing.[14]  Plaintiffs ask for a default presumption that *all* music on video-sharing websites be deemed "obviously" infringing unless the user posts specific information regarding ownership and permission.  No such regime exists or is required by law.

### E.  Plaintiffs Offer No Solution To The Practical Problems Flowing From The District Court's "Red Flag" Rule

Plaintiffs acknowledge (Br. 50-52) but fail to give any persuasive response to the argument by Vimeo and its *amici* that the district court's unworkable standard for "red flag" knowledge will cause numerous practical problems.  *See* Vimeo Br. 31-35; *see also*, *e.g.*, Pinterest Br. 10-21 (describing practical challenges for service providers to determine ownership, authorization, and fair

---

[14]  This is particularly true in light of Vimeo's Terms of Service, Community Guidelines, and Copyright Policy, which require that members may upload only videos for which they possess all necessary rights (including copyrights).  SPA4-5; A187-92 (¶¶2-7, 10-11); A205-14; A219-22.

use); Brief for *Amici Curiae* Google, Facebook, Yahoo!, and Microsoft ("Google Br.") 8-15 (describing adverse consequences of district court's "red flag" standard, including chilling of moderation of harmful online content); EFF Br. 13-22 (describing how district court's approach would increase legal uncertainty, chill speech, force service providers to make discriminating judgments, and result in overblocking of content). The district court's approach places service providers in an untenable position in order to avoid a trial on safe-harbor eligibility: either (1) proactively remove *any* videos containing recognizable music—most likely by implementing an automated content-filtering system; or (2) cease monitoring the site at all to avoid interacting with the materials users post. Either way, the Internet would be worse off and the goals of the DMCA severely undermined. *See*, *e.g.*, Pinterest Br. 21-34 (describing how overbroad application of "red flag" knowledge would frustrate DMCA's goals and discourage voluntary monitoring of content); Google Br. 18-20 (describing how expansion of "red flag" knowledge would undermine stimulation of online investment and innovation).

Such a Hobson's choice does not, as Plaintiffs posit (Br. 51), reflect "the balance Congress struck when it included the DMCA knowledge provisions." Congress, after all, expressly provided that service providers need not monitor their sites or affirmatively seek out infringement. *See* 17 U.S.C. § 512(m). And Congress, as this Court recognized in *Viacom*, set the "red flag" knowledge bar

high, to give no quarter to content "pirates" engaged in "obvious" infringement, while not deterring users from posting, and service providers from hosting, original materials as to which infringement is, at best, a judgment call. The district court's denial of summary judgment to Vimeo on the 18 supposed "red flag" Videos-in-Suit should be reversed.

## II. PLAINTIFFS CANNOT REFUTE THE DISTRICT COURT'S CORRECT DETERMINATION THAT VIMEO WAS NOT WILLFULLY BLIND TO INFRINGING CONTENT IN ANY OF THE VIDEOS-IN-SUIT

Plaintiffs' argument (Br. 52-69) on cross-appeal from the district court's grant of summary judgment to Vimeo on willful blindness depends upon the supposed evidence that Vimeo was *generally* aware, as a matter of "corporate policy" (Br. 54), that videos containing Plaintiffs' music might well be present on its site—as opposed to evidence that Vimeo turned a blind eye to infringement in the *specific* Videos-in-Suit. But in *Viacom*, this Court stated: "[T]he willful blindness doctrine may be applied, in appropriate circumstances, to demonstrate knowledge or awareness of *specific instances* of infringement under the DMCA." 676 F.3d at 35 (emphasis added). Thus, under *Viacom*, Plaintiffs had to establish that Vimeo was willfully blind to infringing content in the 199 specific Videos-in-Suit, with the same specificity that applies to actual or "red flag" knowledge of infringement.

The district court, applying *Viacom*, correctly concluded that Plaintiffs had introduced *no evidence* "suggest[ing] that Vimeo employees were willfully blind to infringing content in any of the 199 Videos-in-Suit." SPA36. Plaintiffs' new test for willful blindness would contravene both the DMCA and *Viacom* by, in effect, imposing upon service providers a "duty to monitor or otherwise seek out infringing activity based on general awareness that infringement may be occurring." *Viacom*, 676 F.3d at 35. The Court should therefore affirm the district court's ruling on willful blindness.

### A. Plaintiffs Fail To Identify Evidence Of Vimeo's Willful Blindness As To The Specific Videos-In-Suit, As The DMCA Requires

The DMCA states that a service provider loses safe harbor if it has "actual" or "red flag" knowledge of infringement; the statute does not mention the term "willful blindness." *See* 17 U.S.C. § 512(c)(1)(A)(i), (ii). This Court has approved the limited use of the common-law doctrine of willful blindness as a substitute for such knowledge, but only where a defendant "was aware of a high probability of the fact in dispute and consciously avoided confirming that fact." *Viacom*, 676 F.3d at 35 (quoting *United States v. Aina-Marshall*, 336 F.3d 167, 170 (2d Cir. 2003)). As *Viacom* recognized, the DMCA itself further "limits … the [willful blindness] doctrine" beyond its already limited scope at common law, 676 F.3d at 35, through the inclusion of § 512(m), which forbids conditioning safe harbor upon "a service provider monitoring its service or affirmatively seeking facts indicating

infring activity." Indeed, this Court noted that "§ 512(m) is incompatible with a broad common law duty to monitor or otherwise seek out infringing activity based on general awareness that infringement may be occurring." 676 F.3d at 35.[15]

Rather than cite any *specific* infringing uses of their music to which Vimeo was willfully blind, Plaintiffs urge (Br. 54-55) this Court to adopt a new willful blindness test—namely, that willful blindness may be demonstrated by reference to Vimeo's *general* "corporate policy" with respect to "music" or "Plaintiffs' music." But *Viacom* precludes any such test, for it requires identification and analysis of *specific* instances of infringement to which a service provider may have turned a blind eye. *See also* Google Br. 15-18 (describing how Plaintiffs' approach is at odds with *Viacom*). Just as this Court confirmed that the "actual" and "red flag" knowledge provisions of § 512(c)(1)(A)(i) and (ii) "both apply only to *specific* instances of infringement," 676 F.3d at 31 (emphasis added); *see also id.* at 34 (remanding for determination "whether any *specific* infringements of which YouTube had knowledge or awareness correspond to the *clips-in-suit*") (emphases added), so the Court held that, in the DMCA context, the doctrine of willful blindness is necessarily limited to "*specific instances* of infringement under

---

[15] Because the doctrine's application to the DMCA safe harbor is further "limit[ed]" by § 512(m), *Viacom*, 676 F.3d at 35, Plaintiffs' discussion (*e.g.*, Br. 52-54) of case law on common-law willful blindness *outside* of the DMCA context is inapposite.

§ 512(c)(1)(A)." *Id.* at 41 (emphasis added); *see also*, *e.g.*, *Shelter Capital*, 718 F.3d at 1023 (no willful blindness because "the DMCA recognizes that service providers who do not locate and remove infringing materials they do not *specifically* know of should not suffer the loss of safe harbor protection") (emphasis added); *Capitol Records, Inc. v. MP3tunes, LLC*, No. 07-cv-9931, 2014 WL 4851719, at *5 (S.D.N.Y. Sept. 29, 2014) ("Only knowledge of *specific* instances of infringement bars a service provider from the safe harbor.") (emphasis added); *Viacom*, 940 F. Supp. 2d at 116 ("what disqualifies the service provider from the DMCA's protection is blindness to *specific* and identifiable instances of infringement") (emphasis added) (quotation marks omitted).[16]

Viacom does not permit assessing willful blindness at a different level of specificity than that mandated for assessing actionable actual or "red flag" knowledge, for which it serves as a proxy. To do otherwise would unmoor willful blindness from the statutory knowledge provisions that make it potentially relevant at all. Thus, the district court correctly explained:

---

[16] This analysis is confirmed by § 512(c)(1)(A)(iii), which instructs that "upon obtaining such knowledge or awareness"—*i.e.*, actual or "red flag" knowledge—a service provider must "act[] expeditiously to remove, or disable access to, *the material*" (emphasis added). *See Viacom*, 676 F.3d at 30 ("[T]he nature of the removal obligation itself contemplates knowledge or awareness of specific infringing material, because expeditious removal is possible only if the service provider knows with particularity which items to remove.").

Logically, then, just as the knowledge prong of § 512(c) may be met only where the plaintiff is able to prove actual or red flag knowledge as to the specific infringing content at issue in the litigation, *Viacom*, 676 F.3d at 34, so too must proof of willful blindness be tailored to that same infringing content. To hold otherwise—*i.e.*, that instances of willful blindness as to infringing content collateral to the litigation are sufficient to divest a defendant of safe harbor protection—would swallow *Viacom*'s requirement that actual or red flag knowledge be specific to the sued-upon content.

SPA35; *see also* SPA80-81 ("In view of the Circuit's holding that 'actual' or 'red flag' knowledge must relate to 'specific and identifiable instances of infringement,' it seems that proof of willful blindness must also be tied to specific instances of infringement.") (citation omitted); *Viacom*, 940 F. Supp. 2d at 116 (no evidence of willful blindness where "specific locations of infringements are not supplied"). Applying this "specific instances of infringement" analysis to Vimeo, Plaintiffs were required to introduce evidence that Vimeo was willfully blind to the particular 199 Videos-in-Suit. *See* SPA34-37.

Properly applying this test, the district court correctly found that Plaintiffs had failed to produce such evidence, and concluded that the undisputed evidence failed to show "that Vimeo employees were willfully blind to infringing content in any of the 199 Videos-in-Suit." SPA36; *see also* SPA81 ("[A]lthough Plaintiffs cited evidence that suggests that Vimeo employees may have turned a blind eye to

infringement of musical recordings on the website, none of that evidence connects such 'willful blindness' to any of the Videos-in-Suit.").

Nothing has changed on appeal. Plaintiffs fail to cite a single piece of evidence connecting Vimeo's alleged willful blindness to any particular Video-in-Suit. Plaintiffs offer no evidence that (1) Vimeo was aware of a "high probability" that any of the specific Videos-in-Suit contained infringing content, nor that (2) Vimeo took "deliberate actions" to avoid confirming that any Video-in-Suit was infringing. *See Global-Tech. Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2070-71 (2011). Indeed, Plaintiffs do not point to any evidence that Vimeo was even aware of the *existence* of the vast majority of the 199 Videos-in-Suit. This failure of proof disposes of the willful-blindness issue. *See Viacom*, 940 F. Supp. 2d at 117 (granting summary judgment on remand where plaintiff made "no showing of willful blindness to specific infringements of clips-in-suit").

**B.    Plaintiffs' Purported Evidence Of Vimeo's General Policies Cannot Establish Willful Blindness As To The 199 Videos-In-Suit**

Unable to present any evidence that Vimeo was willfully blind to alleged infringements in the *specific* Videos-in-Suit, Plaintiffs instead (Br. 55-59) offer purported examples of Vimeo's *general* awareness of the presence of music in videos on its site and anecdotes about Vimeo's supposed *general* "corporate willful blindness policy" (Br. 56). *Viacom*, however, teaches that willful blindness cannot be "based on general awareness that infringement may be occurring." 676 F.3d at

35.  Each of Plaintiffs' offerings thus is insufficient to raise a question of fact on willful blindness.

*First*, Plaintiffs assert (Br. 55) that Vimeo had a "corporate policy" of deliberately avoiding knowledge of infringement of "a particular category of copyrighted works, namely, music."[17]  The only such "policy" referred to by Plaintiffs, however, is Vimeo's supposed decision not to proactively monitor its website for videos containing copyrighted music.  While Vimeo was entitled to make such a choice under § 512(m), which provides that "DMCA safe harbor cannot be conditioned on affirmative monitoring by a service provider," *Viacom*, 676 F.3d at 35, the evidence fails to show that it had any policy of willful blindness to infringing uses of music in videos.  To the contrary, Vimeo had (and has) a policy of informing inquiring users that adding a third party's copyrighted content to their videos poses an infringement risk and recommending that users contact an attorney with any questions about specific uses.  A824-25 (¶2); A832-917.  Vimeo responded similarly to users' forum posts inquiring about the use of music in

---

[17]  Plaintiffs' characterization disregards the fact that Vimeo's Terms of Service, Community Guidelines, and Copyright Policy all require that members may upload only videos for which they possess all necessary rights (including copyrights) and which do not infringe any third party's rights.  SPA4-5; A187-92 (¶¶2-7, 10-11); A205-14; A219-22.  In addition, every time a user seeks to upload a video, she is directed to Vimeo's rules, which state that the user "must own or hold all necessary rights (copyrights, etc.)" to the video.  A188-89 (¶¶8-9); A215-18.

videos. A825 (¶3); A918-34. Vimeo also voluntarily and routinely removes videos containing copyrighted content—including music—that is obviously infringing on its face without waiting for a DMCA takedown notice. A826 (¶5); A935-43. Plaintiffs' purported evidence of a policy of willful blindness thus amounts (Br. 56) to two "scattered" (SPA45) emails between a user and an employee. Those emails have little probative value to even a generalized conception of willful blindness, and in any event, Plaintiffs fail to connect them to any of the Videos-in-Suit.[18]

*Second*, Plaintiffs assert (Br. 57) that Vimeo knew that users were creating videos containing "Plaintiffs' music," which they apparently define as every musical work in their vast catalog. Plaintiffs fail, however, to adduce any evidence that Vimeo was even aware that any such videos actually existed on its service.[19]

---

[18] Plaintiffs also cite (Br. 56-57) to a few users' comments, posted on Vimeo's forums, generally about music on Vimeo, but such comments are unconnected to any use of music in a specific video, and are thus irrelevant. Plaintiffs also claim (Br. 56) that Vimeo employees "would not remove even videos that they *knew* contained infringing music" absent a DMCA notice—but the evidence cited by Plaintiffs supports only (at most) that these employees were aware of the presence of *music*, not "infringing" music, let alone "obviously" infringing music. *See supra* Part I. In any event, none of these anecdotal examples is connected to a Video-in-Suit.

[19] Plaintiffs confuse the inquiry by pointing out (Br. 57-58) that Vimeo employees posted videos containing Plaintiffs' music, or otherwise "interacted" with such videos posted by others. Such videos have no bearing on the willful blindness

(*footnote continued*)

Mere general awareness that users may upload videos containing "Plaintiffs' music," without concomitant awareness of specific instances of such conduct, is insufficient to implicate the willful blindness doctrine in the DMCA context.[20] In *Viacom*, for example, an employee's estimate "that 75-80%" of the service provider's content "contained copyrighted material," 676 F.3d at 33, was not sufficient to give rise to evidence of willful blindness to specific instances of infringement. Thus, Plaintiffs' anecdotal, inferential "evidence" of general awareness that Plaintiffs' music "might" be used in videos on Vimeo (Br. 59) is irrelevant as a matter of law.

*Third*, Plaintiffs assert (Br. 59-64) that Vimeo refused to take "basic investigative steps" to locate "particular" infringing activity (by which Plaintiffs mean use of anything in their vast music catalog) because Vimeo "refused to implement" filters or other mechanisms to search specifically for and ferret out

---

inquiry, as one cannot be blind to something one has already seen; they instead implicate the "red flag" knowledge inquiry discussed in Part I.

[20] *See*, *e.g.*, *MP3tunes*, 2014 WL 4851719, at *9 (even where defendant is "on notice that its service probably linked to other songs" in plaintiff's catalog, defendant "cannot be required to search for links to Beatles songs to retain the protection of a DMCA safe harbor") (citing *Viacom*, 676 F.3d at 35 & n.10); *see also Viacom*, 940 F. Supp. 2d at 116 (on remand, examples provided by plaintiffs that "give at most information that infringements were occurring with particular works" held insufficient to establish willful blindness because "[t]he specific locations of infringements are not supplied: at most, an area of search is identified, and YouTube is left to find the infringing clip").

videos with music. Again, under § 512(m), Vimeo has no obligation to affirmatively monitor its website for the presence of copyrighted music in original videos. *See Viacom*, 676 F.3d at 35.

Ignoring *Viacom* and the text of the DMCA, Plaintiffs essentially contend that, to be eligible for safe harbor, Vimeo must spend money, hire employees, and deploy technology and procedures to search for, evaluate, and remove any original videos that include Plaintiffs' music. But Congress legislated nothing of the sort— § 512(m) relieves service providers from any duty to affirmatively monitor their systems for *any* infringing content. Plaintiffs' argument (Br. 63) that Vimeo must monitor for infringing uses of copyrighted music because it chose to create tools or take steps to rid its site of certain *other* unwanted content (such as non-original videos or pirated "rips" of movies and TV shows) fares no better: There is no reason why a service provider cannot proactively address unlawful or otherwise problematic content on its site in an incremental fashion consistent with its business priorities and legal obligations, and efforts to punish such a sensible approach will only discourage any voluntary efforts to reduce the incidence of infringing material, to say nothing of undermining a viable business model. *See* H.R. Rep. No. 105-796 at 73 (Oct. 8, 1998) ("This legislation is not intended to discourage the service provider from monitoring its service for infringing material."). As the district court recognized, "Plaintiffs' willful blindness

argument amounts to little more than their frustration that Vimeo did not use sophisticated monitoring technology in its possession to seek out and remove instances of infringing content." SPA36. But "service providers are under no affirmative duty to seek out infringement. … This remains the case even when a service provider has developed technology permitting it to do so." SPA37 (citing *Viacom*, *CCBill*, and *Veoh Networks*).

*Fourth*, Plaintiffs complain (Br. 65-66) that the district court (following *Viacom*) made it too difficult for them to adduce evidence of Vimeo's purported willful blindness to infringement. This is a commentary on the difficulty of proving willful blindness in general, not a reason to lower the standard of proof. Since evidence of willful blindness to a fact merely serves as a proxy for more reliable direct evidence of knowledge of that fact, it should be at least as difficult to establish, if not more so. As noted above, courts routinely grant summary judgment to service providers where a plaintiff fails to present evidence of knowledge of infringement, however it might be established. *See supra* Part I.A; *see also*, *e.g.*, *Shelter Capital*, 718 F.3d at 1023 (no willful blindness where "there is no evidence that Veoh acted in such a manner"). Plaintiffs' inability to adduce evidence of willful blindness does not suggest any infirmity in the district court's analysis (or in *Viacom*); it merely indicates that the district court was correct to grant summary judgment to Vimeo on the record here.

*Finally*, the non-DMCA cases cited by Plaintiffs—such as *In re Aimster Copyright Litigation*, 334 F.3d 643 (7th Cir. 2003), and *Tiffany (NJ) Inc. v. eBay, Inc.*, 600 F.3d 93 (2d Cir. 2010)—are inapposite. For example, Plaintiffs cite *Aimster* (Br. 67) for the proposition that a service provider's "self-imposed blindness to infringement of music results in liability for all such infringements on [its] website," suggesting that Vimeo's purported "blindness" to infringement of copyrighted music may be imputed across the entire site. *Aimster*, however, never discussed the willful blindness doctrine in the context of the DMCA; rather, it simply applied common-law principles to determine whether the defendant was a contributory infringer under *Sony Corp. of America, Inc. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984). *See Aimster*, 334 F.3d at 650. Indeed, *Aimster* addressed the DMCA defense separately, summarily concluding that the defendant was ineligible for safe harbor because it had failed to implement an adequate repeat-infringer policy. *See id.* at 655.[21]

---

[21] Further, *Aimster* involved a defendant that wrote specific encryption code to ensure it would never learn of the presence of infringing material on its service. *See* 334 F.3d at 650. That is a far cry from an absence of monitoring, which is permitted by § 512(m). Vimeo, in contrast, utilizes no such technology or design to insulate itself from knowledge of potential infringements. *See* SPA36 (rejecting same argument because "there is no dispute that the Website has many non-infringing purposes, and, in stark contrast to the defendant in *Aimster*, there is no evidence that Vimeo took affirmative steps to blind itself to infringement on a wholesale basis"). Similarly misplaced in the willful-blindness context is Plaintiffs' contention (Br. 64-66) that Vimeo employees simply *must have* viewed

*(footnote continued)*

Similarly, Plaintiffs' reliance (Br. 59-61) on *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93 (2d Cir. 2010), is misplaced. *Tiffany* was a trademark case, not a copyright case, and thus did not address § 512(c); nor was its analysis subject to the limitations imposed by § 512(m). And in any event, *Tiffany* confirms that the correct unit or level of analysis for application of the willful blindness doctrine is not "music" or "Plaintiffs' music," but "particular infringing transactions," 600 F.3d at 109—here, the Videos-in-Suit.[22]

* * *

There is no dispute that Plaintiffs do not cite a single piece of evidence demonstrating Vimeo's purported willful blindness to infringing content in any of the 199 Videos-in-Suit. This Court should reject Plaintiffs' request that it ignore their failure of proof and "mandate an amorphous obligation to take commercially reasonable steps in response to a generalized awareness of infringement." *Viacom*, 676 F.3d at 31 (quotation marks omitted). Instead, the Court should affirm the

other videos containing "Plaintiffs' music." But in any event, with 12.3 million registered users uploading 43,000 new videos every day, *see* SPA2-3, the notion that Vimeo staff watch every—or even a "vast number[]" (Br. 65)—of the videos on the Vimeo site is absurd.

[22] Plaintiffs also rely on *Tiffany* (Br. 59-61) for the proposition that eBay was not willfully blind to the sale of counterfeit Tiffany products because it developed anti-fraud technologies. The "willful blindness" discussion in *Tiffany*, however, makes no reference to the technology eBay used to detect counterfeit Tiffany products; rather, it rested on a straightforward (but here, inapposite) application of the common-law willful blindness doctrine. 600 F.3d at 109-10.

district court's ruling that Vimeo was entitled to summary judgment because Plaintiffs failed to adduce evidence that Vimeo was willfully blind to infringing content in the particular Videos-in-Suit.

## III. PLAINTIFFS FAIL TO DEMONSTRATE THAT CLAIMS BASED UPON PRE-1972 SOUND RECORDINGS FALL OUTSIDE THE DMCA SAFE-HARBOR PROVISIONS

Plaintiffs do not dispute that the plain text of the DMCA affords qualifying service providers safe harbor for any alleged "infringement of copyright," 17 U.S.C. § 512(c)(1). They nonetheless deny that these broad terms necessarily apply to all copyrighted works, including pre-1972 sound recordings. But the structure and purpose of the DMCA confirm the inclusion of state law claims within the safe harbor provisions, which are intended to clarify and limit service providers' potential liability with respect to works that may be readily uploaded to their online services. S. Rep. at 8.

Plaintiffs' argument to the contrary (Br. 17-25), relies principally on § 301(c) of the Copyright Act, which they suggest walled off pre-1972 sound recordings from all future federal regulation. But § 301(c) merely prevents state-law rights and remedies as to such works from being abrogated by the Copyright Act's broad preemption provisions. Because the DMCA does not abrogate any state-law right or remedy, its inclusion of state-law claims within its safe harbors is easily harmonized with § 301(c). The district court's grant of summary judgment to

37

Plaintiffs as to claims based on pre-1972 sound recordings accordingly should be reversed.

**A.    The Text, Structure, And Purpose Of The DMCA Confirm That The Safe Harbors Apply To All Copyright Claims**

**1.    The Plain Text Of § 512(c) Includes State-Law Copyright Claims Within Its Scope**

Plaintiffs misread the DMCA as applying only to claims of federal copyright infringement.  The DMCA is not so limited.  Under the safe harbors provided by § 512(c), service providers "shall not be liable" for any alleged "infringement of copyright by reason of the storage at the direction of a user."   17 U.S.C. § 512(c)(1).   Because the DMCA does not define the term "infringement of copyright," the term "should be construed in accordance with [its] common-law meaning."   *In re Halpin*, 566 F.3d 286, 292 (2d Cir. 2009).   Plaintiffs do not dispute that the common-law definition of "infringement of copyright" includes within its scope violations of state copyright law.   *See MP3tunes*, 821 F. Supp. 2d at 641 ("It is beyond dispute that the common law meaning of the term 'copyright infringement' encompasses violations of both federal and state protections.") (citing *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2245 (2011)); Vimeo Br. at 37-38 (recounting common-law history of copyrights).   The inquiry should thus end there.   *See Hedges v. Obama*, 724 F.3d 170, 189 (2d Cir. 2013) ("When the

words of a statute are unambiguous, … judicial inquiry is complete.") (quotation marks omitted).

Plaintiffs argue (Br. 26), however, that the term "infringement of copyright" is defined elsewhere in the Copyright Act. They are incorrect. *See*, *e.g.*, 17 U.S.C. § 101 ("Definitions") (defining more than 50 terms as used in the Copyright Act, but not defining "infringement of copyright"). Plaintiffs point (Br. 26) to § 501(a), but that section does not even contain the words "infringement of copyright"—it only states that a person who violates any of the specific federal rights identified in §§ 106 – 122 is an "infringer of the copyright." 17 U.S.C. § 501(a). This provision "simply states that anyone violating the rights established by sections 106 through 122 is an infringer, without suggesting it is all inclusive." *MP3tunes*, 821 F. Supp. 2d at 641.

Indeed, § 501(a) cannot be all-inclusive since, as Vimeo previously observed (Br. 38-39), another section of the Act imposes copyright infringement liability for violations of rights *other* than those listed in §§ 106 – 122. *See* 17 U.S.C. § 1309 (setting forth consequences for "infringement" of vessel hull designs); *Maverick Boat Co. v. Am. Marine Holdings, Inc.*, 418 F.3d 1186, 1191 (11th Cir. 2005) (statute provides "copyright protection"). Consequently, § 501(a) cannot and "does not provide a comprehensive definition of copyright infringement." *MP3tunes*, 821 F. Supp. 2d at 641. Plaintiffs fail to reconcile this discrepancy; nor

do they cite any case construing § 501(a) as exhaustively defining "infringement of copyright."

Instead, Plaintiffs rely almost entirely on a report from the Copyright Office. *See* Br. 26 (quoting *Federal Copyright Protection for Pre-1972 Sound Recordings: A Report of the Register of Copyrights* at 131-32 (Dec. 2011)). But that report merely asserts, without demonstrating, that § 501(a) provides the exclusive definition for the term "infringement of copyright." Such an *ipse dixit* is worthy of no more deference than that of any other third-party commentator.[23] *See Morris v. Bus. Concepts, Inc.*, 283 F.3d 502, 505 (2d Cir. 2002) (Copyright Office held without authority to give opinions, define legal terms, or command any weight on issues of statutory interpretation not yet decided by a court); 5 William F. Patry, *Patry on Copyright* § 17:102 (2014) ("There is no reason to give any deference to the Copyright Office's interpretation of the statute, if by deference we mean crediting an interpretation we wouldn't independent of the Office's

---

[23] Plaintiffs cite (Br. 22-23) *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 283-84 (2d Cir. 2012), for the proposition that "agencies charged with applying a statute … certainly may influence courts facing questions the agencies have already answered." *WPIX* is inapposite. There, the court considered prior Copyright Office positions on § 111's compulsory licensing scheme. Unlike here, the Copyright Office is expressly "charged with overseeing" that licensing regime, *WPIX*, 691 F.3d at 283, and a regulation expressly grants the Copyright Office the authority to interpret the portions of the statute that it "administ[ers]," 37 C.F.R. § 201.2(a)(3). In contrast, the Copyright Office has no authority to administer or oversee any aspect of §§ 501(a) or 512(c).

persuasiveness."); Brief *Amicus Curiae* of the Computer & Communications Industry Association ("CCIA Br.") 7-9 (discussing Copyright Office's erroneous interpretation).

In a similar vein, Plaintiffs argue (Br. 27) that § 512 applies only to "copyright owners," a term they assert "is defined as the owner 'of any one of the exclusive rights comprised in a copyright' as enumerated in Section 106" (quoting 17 U.S.C. § 101). That misreads § 501(a) as well as §§ 101 and 106. The definitional section, § 101, reads: "'Copyright owner,' with respect to any one of the exclusive rights comprised in a copyright, refers to the owner of that particular right." On its face, this definition does *not* (as Plaintiffs suggest) limit such exclusive rights to those "enumerated in Section 106" or any other group of *federal* rights.[24] Instead, the definition supports Vimeo's position by recognizing that the term "copyright owner" has meaning *beyond* the federal copyright laws. *See also* 17 U.S.C. § 106 ("the owner of copyright *under this title* has [certain] exclusive rights") (emphasis added). A "copyright owner" can also have non-federal rights in the work—otherwise there would be no reason for § 106 to limit the exclusive rights at issue to those "under this title." Plaintiffs' own example confirms that

---

[24] The "exclusive rights" referred to in § 106 are rights to exclude others from engaging in particular acts, such as reproduction and distribution of copyrighted works. *See* 17 U.S.C. § 106(1)-(6).

§ 512(c) applies to "copyright owners" of *any* exclusive rights comprised in copyright, regardless of source.

> **2.** **The Structure Of The Copyright Act Confirms That The Safe Harbors Apply To Claims Based On Pre-1972 Sound Recordings**

Plaintiffs' argument (Br. 25-30) that § 512(c) does not apply to state-law claims based on pre-1972 sound recordings runs counter to the structure of the Copyright Act as a whole. *See Utility Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2441 (2014) ("[T]he fundamental canon of statutory construction [is] that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.") (quotation marks omitted). When Congress intends to limit the reach of a provision of the Copyright Act to federal copyrights, it consistently uses language expressing that intent by stating that the provision is limited to copyrights recognized under "this title." *See*, *e.g.*, 17 U.S.C. §§ 101, 102(a), 104(a)-(b), 105, 106, 201, 203(b). For example, one may not bring claims "*under this title* alleging infringement of copyright" based on activities associated with certain types of audio recording devices. *Id.* § 1008 (emphasis added). Similarly, a claim for circumventing digital rights management technology is available only insofar as the technology "controls access to a work protected *under this title*." *Id*. § 1201(a)(1)(A) (emphasis added). Such examples demonstrate that Congress knew how to limit the application of § 512(c) to claims for "infringement

42

of [federal] copyright"—by writing "infringement of copyright under this title."
*See Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S. Ct. 1351, 1358 (2013) ("under this title" limits provision to rights conferred under Copyright Act). Congress's decision not to so limit the safe-harbor provisions speaks volumes.

Plaintiffs assert (Br. 30) that "virtually every other limitation on rights and remedies of copyright owners articulated within the Act employs the term '*infringement of copyright*' without ... the limiting phrase 'under this title,'" suggesting that, under Vimeo's interpretation, none of those limitations would apply beyond federal copyrights. But Plaintiffs fail to mention that these "limitations" have *already* been so qualified. Each provision cited by Plaintiffs— §§ 107, 108, 111(a), 112(a)(1), and 121(a)-(c)—limits the copyright owner's rights set forth in § 106, which in turn states: "*Subject to sections 107 through 122*, the owner of copyright *under this title* has the exclusive rights to do and to authorize" certain acts. (Emphases added.) Thus, each of the "limitations" cited by Plaintiffs—and every other "limitation" imposed by §§ 107 – 122—applies only to the federal rights conferred "under this title." That § 106 does not include § 512 in the list of "limitations" to the rights provided "under this title," as it did expressly for §§ 107 – 122, confirms that § 512(c) is not confined to federal copyrights.[25]

---

[25] Indeed, *other* parts of § 512 that do not involve safe harbor include "under this title" language, indicating that if Congress wanted to include such language in

(*footnote continued*)

*See*, *e.g.*, *INS v. Cardoza–Fonseca*, 480 U.S. 421, 432 (1987) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.").

Plaintiffs also overlook that Congress has previously shown that it knows how to specifically exclude works protected by state law from the ambit of federal protection (or preemption). Section 1101 of the Copyright Act, for example, provides that one who captures and redistributes a live musical performance without the performer's consent "shall be subject to the remedies provided in sections 502 through 505, to the same extent as an infringer of copyright." 17 U.S.C. § 1101(a). The provision goes on to state, in a section titled "State Law Not Preempted," that "[n]othing in this section may be construed to annul or limit any rights or remedies under the common law or statutes of any State." *Id.* § 1101(d). That provision (which mirrors § 301(c), discussed *infra* Part III.B) was added to the Copyright Act in 1994, four years *before* the DMCA was enacted. *Compare* Pub L. 103-465, § 512 (Dec. 8, 1994) (§ 1101), *with* Pub. L. 105-304, § 202 (Oct. 28, 1998) (§ 512). Thus, "when Congress wished to [exclude works protected by state law], it knew how to do so and did so expressly." *See Conboy v. AT&T Corp.*,

---

§ 512(c), it would have done so. *See*, *e.g.*, 17 U.S.C. § 512(h)(2)(C) (subpoenas in federal courts); § 512(l) (other defenses available).

241 F.3d 242, 253 (2d Cir. 2001) (addressing Telecommunications Act). Plaintiffs quote § 1101(d) (Br. 18-19 n.9) without acknowledging that it supports Vimeo, not Plaintiffs.

Plaintiffs argue (Br. 27-28) that Congress would have discussed pre-1972 sound recordings in the DMCA legislative history if it had intended to include such works in the scope of the safe-harbor provisions. Congress's failure to mention pre-1972 sound recordings in the DMCA's text or legislative history *is* telling—but not for the reasons Plaintiffs surmise. The overriding purpose of the DMCA was to establish a comprehensive regime that would "'clarify the liability faced by service providers who transmit potentially infringing material over their networks.'" *Viacom*, 676 F.3d at 27 (quoting S. Rep. at 2) (alteration omitted). The safe harbors respond to this concern by "protect[ing] qualifying service providers from liability for *all* monetary relief for direct, vicarious and contributory infringement." S. Rep. at 20 (emphasis added). Given Congress's intent to fashion a comprehensive solution to the problem of online copyright infringement, and given that Congress knew how to exclude works protected by state law from its enactments, one would have expected Congress at least to have discussed *the exclusion* of pre-1972 sound recordings from the reach of the safe harbors had exclusion in fact been intended. *See Am. Library Ass'n v. FCC*, 406 F.3d 689, 704 (D.C. Cir. 2005) ("Congress 'does not … hide elephants in

mouseholes.'") (quoting *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 468 (2001)).

Finally, Plaintiffs claim (Br. 28-29) that providing safe harbor against state-law copyright claims based on pre-1972 sound recordings "ignores the existence of state law claims for unfair competition, conversion, and misappropriation," leading to the result that "common law copyright claims would be limited by the DMCA, but other state common law claims would not." This is a red herring. The entire Copyright Act—including the DMCA—deals only with *copyright* claims; unfair competition, conversion, and misappropriation are different torts with different elements.[26]

### 3. Plaintiffs Do Not Dispute That Excluding Claims Based On Pre-1972 Sound Recordings From Safe Harbor Would Undermine The DMCA

As Plaintiffs implicitly concede, excluding pre-1972 sound recordings from the ambit of the DMCA safe harbors would frustrate the central purpose of the DMCA: to clarify and limit service providers' "legal exposure for infringements that may occur in the course of their activities" by creating safe harbors that

---

[26] Congress already allows state-law claims, such as unfair competition and conversion, to be brought concomitantly with federal copyright claims, belying Plaintiffs' claim (Br. 29) of "inconsistent treatment." *See, e.g., Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 717-18 (2d Cir. 1992) (state-law claims overlapping with federal copyright claims permitted where "extra element" alleged).

"protect qualifying service providers from liability for all monetary relief for direct, vicarious and contributory infringement." S. Rep. at 20. The protection from liability for "*all*" forms of copyright infringement is fundamental—there is little point to the safe harbors if massive swaths of outlying content could render their protections irrelevant. *See MP3tunes*, 821 F. Supp. 2d at 642 ("Limiting the DMCA to recordings after 1972, while excluding recordings before 1972, would spawn legal uncertainty and subject otherwise innocent internet service providers to liability for the acts of third parties."). Put another way, no harbor is safe if only federal waves are kept at bay, while state waves can still come crashing through.

Plaintiffs (Br. 31) and their *amici* brush aside as "illusory" Vimeo's serious concerns. But Plaintiffs nowhere explain how the purposes of the DMCA may be meaningfully preserved absent application of safe harbor to pre-1972 sound recordings. And Plaintiffs offer no practical response to the logistical nightmare that would face service providers were the safe harbors limited in the manner proposed. For example, excluding pre-1972 sound recordings from the safe-harbor regime would require service providers to make near-impossible determinations about the particular date that a particular sound recording was first "fixed." How many of us could say with confidence whether *any* song from the early 1970s was first "fixed" before or after February 15, 1972? Given Vimeo's size, the only way for it to host audiovisual content containing sound recordings of any kind would be

to implement an automated music-filtering computer program that keeps records of the precise day that every particular version of every song in existence was recorded (and not just published). Even assuming that such a filter exists, such a "solution" would be both financially onerous and in direct conflict with § 512(m).[27]

Rather than confront these realities, Plaintiffs direct (Br. 31-32) service providers to Congress, noting that it was aware when it enacted § 301(c) that it was creating a dual federal-state copyright system for sound recordings. But "Congress passes legislation with specific purposes in mind," and "[w]hen the ordinary tools of statutory construction permit [the Court] to do so, [it] must attempt to discover those purposes from the text, structure and history" of the statute. *Price Trucking Corp. v. Norampac Indus., Inc.*, 748 F.3d 75, 82 (2d Cir. 2014). The question is not what Congress intended when it passed § 301(c) in 1976, but rather what Congress intended when it passed § 512(c) in 1998. The ordinary tools of construction demonstrate that Congress intended for § 512(c) to protect qualifying service providers against "all" copyright infringement claims arising out of content

---

[27] In addition, service providers would face uncertainty as to how to treat DMCA takedown notices from record companies that make use of the DMCA for claims based on pre-1972 sound recordings. Must they provide an opportunity for a counter-notification? How should they treat users who upload such works insofar as their repeat-infringer policy is concerned?

posted on their sites by others. S. Rep. at 20. The contrary position—leaving service providers wide open to a fifty-state patchwork of infringement claims based on pre-1972 sound recordings—defies common sense. *See SEC v. DiBella*, 587 F.3d 553, 572 (2d Cir. 2009) ("Where an examination of the statute as a whole demonstrates that a party's interpretation would lead to absurd or futile results plainly at variance with the policy of the legislation as a whole, that interpretation should be rejected.") (quotation marks omitted).

Because the text, structure, and purpose of § 512(c) all favor the application of the DMCA safe harbors to copyright claims based on both federal and state law, this Court need proceed no further. Congress spoke directly on the issue, and this Court should apply § 512(c) as written, without inserting any implicit exceptions.

### B.  Plaintiffs Are Incorrect That § 301(c) Excludes Claims Based On Pre-1972 Sound Recordings From Safe Harbor

Plaintiffs argue (Br. 17-25) that § 301(c), enacted in 1976, precludes the 1998 DMCA from providing a safe harbor against copyright claims based upon pre-1972 sound recordings. Plaintiffs are incorrect. Read in its proper context and considered in light of its purpose, § 301(c) has no bearing on DMCA safe harbors and is fully compatible with the protections afforded by § 512(c). Indeed, the record labels in this case have issued DMCA take-down notices for pre-1972 sound recordings. *See* CCIA Br. 11-12.

1. **Congress Did Not Intend That § 301(c) Preclude All Future Regulation Of Pre-1972 Sound Recordings, And It Is Thus Compatible With § 512(c)**

Plaintiffs do not dispute that § 301(c) was enacted by Congress to serve a very specific purpose: to prevent state anti-piracy statutes concerning phonograph records from being abrogated by the Copyright Act's broad preemption provision. *See* Vimeo Br. 47-49. Specifically, the executive branch expressed concern that the preemption provision "could be read as abrogating the *anti-piracy laws* now existing in 29 states." H.R. Rep. No. 94-1476, at 133 (Sept. 3, 1976) (emphasis added). Congress added § 301(c) to stave off a "resurgence of piracy." *Id.*

There is no indication, however, that Congress intended § 301(c) to bar any and all forms of future legislation that may impact pre-1972 sound recordings.[28] *See MP3tunes*, 821 F. Supp. 2d at 641 ("Read in context, section 301(c) is an anti-preemption provision ensuring that the grant of federal copyright protection did not interfere with common law or state rights established prior to 1972. But section 301(c) does not prohibit all subsequent regulation of pre-1972 recordings."). Because the safe harbors have no bearing on state anti-piracy statutes, nor the

---

[28] In "determining the scope of the statute," a court must "interpret that language in light of the purposes Congress sought to serve by promulgating the relevant laws." *United States v. Mitchell*, 328 F.3d 77, 81 (2d Cir. 2003) (quotation marks omitted). Courts should be wary of attempts to preclude future legislation since it is well settled that "one legislature may not bind the legislative authority of its successors." *United States v. Winstar Corp.*, 518 U.S. 839, 872 (1996) (citation omitted).

preservation of state copyright laws as a general matter, application of § 512(c) to pre-1972 sound recordings does not conflict with the purpose of § 301(c).

Rather than acknowledge the purpose of § 301(c), Plaintiffs argue (Br. 17-20) that pre-1972 sound recordings are not subject to federal copyright law.  To be sure, § 301(c) sought to preserve state anti-piracy laws applicable to pre-1972 sound recordings from the broad preemption mandated by § 301.  But § 512(c) does not seek to abrogate such laws; it represents a judgment by Congress to afford service providers a qualified defense to liability for *any* form of copyright infringement. *See supra* Part III.A.  Under § 512(c), state and common-law protections for pre-1972 sound recordings are not preempted and remain in effect.  Plaintiffs may still bring claims against service providers for state-law copyright infringement; § 512(c) merely allows service providers the opportunity to establish a safe-harbor defense to monetary liability.[29]

Because § 301(c) is compatible with § 512(c)—both can coexist in harmony without frustrating each other's purpose—they are not in conflict and this Court

---

[29]  Plaintiffs' reliance (Br. 21-22) on *UMG Recordings, Inc. v. Escape Media Group, Inc.*, 964 N.Y.S.2d 106 (1st Dep't 2013), is unfounded.  There, the First Department expressed the view that if the DMCA applied to pre-1972 sound recordings, the "right to immediately commence an action would be eliminated." *Id.* at 111.  That is incorrect, as this case demonstrates—the DMCA affords a potential defense to all copyright infringement claims; it does not foreclose commencement of an action.

may and should give effect to both statutes.  *See MP3tunes*, 821 F. Supp. 2d at 640

("there is no conflict between § 301 and the DMCA's safe harbors for infringement

of pre-1972 recordings").  Just as § 301(c) was passed to address a particular issue

that arose in the 1960s, § 512(c) was passed to address a particular issue that arose

in the 1990s and continues today.  Plaintiffs' alternative reading of § 301(c) would

exempt an entire swath of copyrightable works from the reach of safe harbor and

"would eviscerate the purpose of the DMCA"—an outcome Congress could not

have intended when it enacted § 512(c) with § 301(c) on the books.  *MP3tunes*,

821 F. Supp. 2d at 641; *see also Yeardon v. Henry*, 91 F.3d 370, 376 (2d Cir. 1996)

("Where an examination of the statute as a whole demonstrates that a party's

interpretation would lead to 'absurd or futile results … plainly at variance with the

policy of the legislation as a whole,' that interpretation should be rejected.")

(quotation marks omitted).

> ## 2. Contrary to Plaintiffs' Assertion, The DMCA Does Not "Annul" Or "Limit" Any State Right Or Remedy Relating To Pre-1972 Sound Recordings

Plaintiffs are incorrect (Br. 17-20) that the DMCA annuls or limits any

substantive right or remedy of a copyright holder, whether state or federal.  The

DMCA does not alter the scope of a copyright holder's rights; it provides a defense

to a DMCA-compliant service provider when a user uploads a work to a platform.

Under the DMCA, copyright owners may continue to press claims for monetary

relief against direct infringers and non-compliant service providers, and may seek equitable relief from all service providers and direct infringers alike. If a copyright holder cannot obtain monetary damages from a service provider, that is only because the service provider demonstrated, among other things, that it had a working notice-and-takedown process and expeditiously removed the copyright holder's work upon receipt of a valid takedown notice.

Plaintiffs do not substantively dispute these propositions; rather, they focus (Br. 20-21) on the word "limitation" in the DMCA. But the question is not whether the word "limitation" appears in the DMCA, but what the DMCA's actual *effect* is, if any, on state or common-law rights in pre-1972 sound recordings. Because no rights in pre-1972 sound recordings are substantively changed by the DMCA, and because the same remedies for infringement of pre-1972 sound recordings remain available to copyright owners, the DMCA cannot be said to "annul or limit" any rights or remedies in pre-1972 sound recordings within the meaning of § 301(a).

Finally, in order for the DMCA to "limit" any right or remedy, the right or remedy must have existed in the first place—that is, New York common law would otherwise impose liability on Vimeo. Thus, Plaintiffs argue (Br. 24) that the First Department held in *Escape Media* that New York common law would recognize service-provider liability in a case like this. But *Escape Media* never

addressed the issue, and it does not appear that the parties briefed the underlying state-law issues. Rather, *Escape Media*'s holding was based upon a (flawed) interpretation of the interplay between two federal statutes (§ 301(c) and the DMCA).[30] Plaintiffs' reliance (Br. 24) on *Arista Records LLC v. Lime Group LLC*, 715 F. Supp. 2d 481, 519-20 (S.D.N.Y. 2010), is similarly misplaced—*Arista* addressed *inducement* liability under state law. Because one who induces infringement cannot claim safe harbor,[31] *Arista* says nothing about whether a DMCA-compliant service provider like Vimeo would be subject to liability.

To the contrary, as explained in Vimeo's opening brief (Br. 52-56), New York common law would likely *decline* to impose secondary liability on a service provider who complied with the DMCA. The New York Court of Appeals, for example, has consistently adopted rules limiting service provider liability so that these services may continue to operate without undue interference. *See*, *e.g.*, *Firth v. State*, 775 N.E.2d 463, 466 (N.Y. 2002) (unreasonable to subject website to "single publication" rule that would result in "a serious inhibitory effect on the open, pervasive dissemination of information and ideas over the Internet"); *Lunney*

---

[30] In addition, this Court is not bound by the law of New York as interpreted by a state intermediate appellate court. *See*, *e.g.*, *Licci v. Lebanese Canadian Bank, SAL*, 739 F.3d 45, 48 (2d Cir. 2013).

[31] *See Viacom*, 676 F.3d at 38 ("inducement of copyright infringement … might … rise to the level of control under § 512(c)(1)(B)," disqualifying a service provider from safe harbor) (citation omitted).

*v. Prodigy Servs.*, 723 N.E.2d 539, 542 (N.Y. 1999) (unreasonable to expect service provider "to examine and screen millions of e-mail communications, on pain of liability for defamation"). Because New York common law would likely adopt and apply DMCA safe-harbor principles regarding copyright claims based on pre-1972 sound recordings, the DMCA cannot be said to "limit" such claims under New York law.

## CONCLUSION

The Court should: (1) *reverse* the district court's denial of summary judgment to Vimeo on the 18 "red flag" Videos-in-Suit; (2) *affirm* the district court's grant of summary judgment to Vimeo on willful blindness; and (3) *reverse* the district court's grant of summary judgment to Plaintiffs on pre-1972 sound recordings.

Dated: December 22, 2014

Respectfully submitted,

/s/ Kathleen M. Sullivan
Kathleen M. Sullivan
Robert L. Raskopf
Todd Anten
QUINN EMANUEL URQUHART &
  SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010

Rachel Herrick Kassabian
QUINN EMANUEL URQUHART &
  SULLIVAN, LLP
555 Twin Dolphin Dr., 5th Flr.

Redwood Shores, CA 94065

Michael A. Cheah
VIMEO, LLC
555 West 18th Street
New York, New York 10011

*Attorneys for Defendants-Appellants-*
*Cross-Appellees Vimeo, LLC and*
*Connected Ventures, LLC*

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2)(A)(i) because this brief contains **<u>13,620</u>** words (based on the Microsoft Word word-count function), excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using **<u>Microsoft Word</u>** in **<u>14 point Times New Roman</u>**.

Date: February 18, 2015

/s/ Todd Anten
Todd Anten
QUINN EMANUEL URQUHART &
  SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on February 18, 2015, the RESPONSE AND REPLY BRIEF FOR DEFENDANTS-APPELLANTS-CROSS-APPELLEES was electronically filed and served on all parties or their counsel of record through the CM/ECF system, pursuant to Second Circuit Local Rule 25.1(h).

Date: February 18, 2015

/s/ Todd Anten
Todd Anten
QUINN EMANUEL URQUHART &
  SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010